# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| CHRISTINA STEGEMANN, on behalf of the GANNETT CO., INC. 401(k) SAVINGS PLAN and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> GANNETT CO., INC. and THE GANNETT BENEFIT PLANS COMMITTEE, <br><br> Defendants. | Civil Action No. 1:18-cv-00325-AJT-JFA <br><br> CLASS ACTION |

## AMENDED COMPLAINT

Plaintiff Christina Stegemann ("Plaintiff"), on behalf of the Gannett Co., Inc. 401(k) Savings Plan (the "Plan" or "Gannett Plan") and a class of similarly situated participants in the Plan, brings this action against Gannett Co., Inc. ("Gannett") and the Gannett Benefit Plans Committee ("the Committee"), which is the Plan's administrator, pursuant to § 502, and alleging violations of §§ 404, 405, 409, of the Employee Retirement Income Security Act of 1974 ("ERISA") (codified, respectively, at 29 U.S.C. §§ 1132, 1104, 1105, and 1109). Plaintiff alleges the following based upon the investigation conducted by his counsel, including, among other things, a review of filings by Gannett and TEGNA Inc. ("TEGNA") with the United States Securities and Exchange Commission and the United States Department of Labor; press releases and other public statements issued by Gannett and TEGNA; analyst reports; media reports about Gannett and TEGNA; and information obtained through discovery. Plaintiff believes that further

discovery, which is ongoing, will provide substantial additional evidentiary support for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND SUMMARY OF CLAIMS

1.     This action concerns TEGNA's June 29, 2015 (the "date of separation") spinoff of its publishing business into a new entity, Gannett, and the failure of the Plan's fiduciaries to timely liquidate the Plan's significant holdings in TEGNA common stock. Defendants' decision to concentrate Plan investments in TEGNA common stock was a breach of their fiduciary duties, and these breaches have caused the Plan and the Class more than $38 million in losses.

2.     Plaintiff is a participant in the Plan. She brings this action concerning the Plan's investment in the common stock of TEGNA on behalf of the Plan and a class of participants in the Plan whose retirement assets were invested in TEGNA common stock, including the "TEGNA Stock Fund," from July 1, 2016 until the present (the "Class Period").

3.     Defendants maintained the TEGNA Stock Fund — an undiversified fund invested exclusively in TEGNA common stock (traded on the New York Stock Exchange under the ticker "TGNA"), as a Plan investment option, through at least July 31, 2018.

4.     Defendants' decision to continue to invest Plan assets in a single company's common stock during the Class Period was a breach of their duties of loyalty, prudence, and diversification under ERISA § 404, 29 U.S.C. § 1104.

5.     TEGNA common stock is not an "employer security" as that term is defined under ERISA, and thus, the TEGNA Stock Fund was subject to ERISA's diversification requirements.

6.     Defendants breached their fiduciary duties by permitting the Plan to invest in TEGNA common stock for several reasons, including, but not limited to, the following:

(a)   *First*, Defendants improperly allowed the Plan to continue offering the TEGNA Stock Fund, even though they knew that the Fund was undiversified and, as a result, more volatile and riskier for Plan Participants than alternative investment options;

(b)   *Second*, Defendants caused the Plan to be undiversified by their failure to liquidate the Plan's substantial holdings of TEGNA common stock following the separation, thereby subjecting the Plan and its participants to the risks associated with being too heavily invested in one company ("company risk") and industry ("industry risk"). At the end of 2015 and 2016, TEGNA common stock represented over 80% and 74%, respectively, of the Plan's total common stock holdings (excluding Gannett stock)— an imprudent and unnecessary undiversified risk for the workers and retirees who depend on the Plan for their retirement savings.

(c)   *Third*, Defendants' prolonged failure to liquidate the Plan's TEGNA common stock holdings subjected participants to additional risks because the Plan was already heavily invested in Gannett common stock and both TEGNA and Gannett are "consumer-cyclical" stocks — their performance is heavily dependent on the business cycle and economic conditions ("sector" or "cyclical risk"). Thus, Gannett and TEGNA stock exhibit high correlation. At the end of 2015 (more than six months following the separation), the Plan's TEGNA and Gannett common stock holdings collectively comprised more than 26% of the Plan's total assets (18% was TEGNA; 8.4% was Gannett).

(d)   *Fourth*, the imprudence of Defendants in holding such massive amounts of TEGNA common stock is further evidenced by the fact that TEGNA is a volatile stock. Indeed, toward the end of 2015, TEGNA common stock was approximately 90% more volatile than the stock market as a whole.

(e)     *Fifth*, while Defendants ultimately decided to close the TEGNA stock fund, they unreasonably delayed the decision for two years after the spinoff of Gannett, and even after they made the decision, took over a year longer to implement it.  Defendants knew long in advance of the date of separation that TEGNA stock should be sold. In fact, the Employee Matters Agreement ("EMA") between TEGNA and Gannett, which dealt with, *inter alia,* issues affecting the benefits of the employees of the formerly unified company who became Gannett employees after spin-off, specifically mandated that the TEGNA Stock Fund be terminated.  In light of the TEGNA Stock Fund's undiversified nature, its volatility, and the facts that it represented the largest investment in the Plan by far, was positively correlated with another major, undiversified Plan investment (Gannett company stock), and was no longer was an "employer security" exempt from ERISA's diversification requirements, Defendants should have immediately commenced a process for effectuating the EMA's mandate to liquidate the Plan's investment in the TEGNA Stock Fund.  Had they done so, all or at least most Plan Participants would have divested their TEGNA Stock Fund holdings by the beginning of the Class Period.

7.     Gannett is liable for the acts of the Committee in that the Committee and its members were acting within the scope of their employment with Gannett. Moreover, members of Gannett's board of directors, including its CFO, shared discretionary authority with the Committee to determine if and when to liquidate the TEGNA Stock Fund.  Gannett also failed to adequately monitor the Committee and its members to ensure that they were meeting their fiduciary obligations.

8.     Prudent fiduciaries of retirement plans would not have permitted such a concentrated investment in the volatile stock of a single company, particularly for so long. Defendants breached their duties under ERISA to diversify the Plan's investments by allowing the

Plan to have an unreasonably high percentage of its assets invested in TEGNA common stock during the Class Period.

9.       Because of the lack of diversification, Defendants should have been particularly attentive to the numerous warning signs that showed TEGNA stock was an imprudent investment for retirement assets generally and the Plan specifically, but they failed to take action as the price of TEGNA stock dropped from $20.24 on the day of the spin-off to its current price of approximately $11. The Plan's overly concentrated position caused participants to lose over $43 million as the price of TEGNA stock fell dramatically during the Class Period.

10.      As a result of these breaches, each Defendants are liable to the Plan for all losses resulting from each of their breaches of fiduciary duty. Plaintiff also seeks equitable relief.

## JURISDICTION AND VENUE

11.      <u>Subject Matter Jurisdiction</u>. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

12.      <u>Personal Jurisdiction</u>. This Court has personal jurisdiction over all Defendants because they are all residents of the United States and ERISA provides for nation-wide service of process pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

13.      <u>Venue</u>. Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because it was where the Plan is administered and some or all of the fiduciary breaches for which relief is sought occurred.

## PARTIES

14.      Plaintiff Christina Stegemann is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held shares of TEGNA common stock in her Plan account during the Class Period. She is a resident of Phoenix, Arizona. During the Class Period, the value of the TEGNA common stock held in Plaintiff's accounts diminished considerably and Plaintiff,

like thousands of other Plan participants, suffered losses resulting from Defendants' breaches of fiduciary duty.

15.     Defendant Gannett Co. Inc. is a Delaware Corporation with its principal place of business in McLean, Virginia.

16.     Gannett is a fiduciary because it exercised discretionary authority or control over management of the Plan, exercised authority or control over the management or disposition of Plan assets and/or had discretionary authority, and because it had discretionary authority to appoint and monitor Plan fiduciaries who had authority or control over management or disposition of Plan assets.

17.     Defendant Committee is an unincorporated association with a principal place of business in McLean, Virginia. It consists of five members appointed by the Gannett Board.  The Board appointed Jon Held, Lori Locke, Caryn McGarry and Minakshi Sundaram on June 22, 2015, and appointed David Harmon chair effective July 13, 2015.  Patrick McClanahan replaced Jon Held sometime between September 15, 2016 and November 17, 2016, and Stacey Cunningham replaced Caryn McGarry sometime in the first quarter of 2017.

18.     The Committee is the named fiduciary of the Plan.  In addition, the Committee is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority or control over management of the Plan, exercised authority or control over the management or disposition of Plan assets and/or had discretionary authority to appoint and monitor Plan fiduciaries who had authority or control over management or disposition of Plan assets.

19.     The Plan's Summary Plan Description (SPD) states that the Committee "has full responsibility for administering the Plan."  *See* SPD at p. 29.  The Committee's responsibilities included "[s]upervising the management of Plan assets…"  *Id*.

### THE SPINOFF OF GANNETT

20.     On August 5, 2014, TEGNA — which was named "Gannett Co., Inc." before the spinoff — announced that its board of directors had authorized the spin-off of its publishing segment into a new, independent, publicly-traded company, which would take the Gannett name.

21.     TEGNA completed the spinoff on June 29, 2015, more than ten months later. The result of the spinoff was two publicly traded companies: (1) TEGNA, which is a broadcasting and digital company and (2) the new Gannett — taking the name "Gannett Co., Inc." previously used by TEGNA — which is a publishing company with affiliated digital assets. TEGNA distributed one common share of Gannett common stock for every two shares of TEGNA common stock held by TEGNA stockholders.

22.     Because the entities had not traded separately, the market had not established the relative value of each of the two separated entities, and therefore, the price paid by the Plan for TEGNA stock was not, as an initial matter, set by market forces.

23.     Along with the documents formalizing the spinoff, the two new entities – TEGNA and Gannett Co., Inc. – simultaneously entered into the EMA "to set forth the terms and conditions of certain employment, compensation and benefit matters" that were ancillary to the separation agreement.  EMA at Recitals, Gannett-0002831.

24.     The EMA specifically provided that, after the effective date of the spinoff, "all outstanding investments in" the TEGNA Stock Fund "***shall*** be liquidated and reinvested in other investment funds offered" in the Plan, "on such dates and in accordance with such procedures as are determined by the administrator of the" Plan.  EMA § 5.03(f), Gannett-0002852 (emphasis

added).  The Plan document dated June 10, 2015, which remains the operative version, specifically provides that the EMA "may be used as an aid in interpreting the terms of the transitions" involving the spin-off of Gannett from TEGNA.  Plan Document at Preamble, Gannett-0000151.

## DESCRIPTION OF THE PLAN

25.     TEGNA established the Plan in 1990.  On June 10, 2015, the Plan was re-stated to make Gannett the sponsor of the Plan and its related trust effective on the date of the separation. On the date of the separation, the Plan held over 13 million shares of TEGNA stock valued at approximately $269 million.

26.     The Plan is an employee benefit plan within the meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

27.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34) because it provides individual accounts for each participant and benefits based upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which could be allocated to such participants' accounts.

28.     The Plan's purpose is "to help (participants) build a nest egg for (their) retirement." *See* SPD at p. 1.

29.     The Plan had over 15,000 participants as of December 31, 2016.

30.     At all times since the date of separation, June 29, 2015, the Committee has been responsible for selecting, monitoring, administering, and removing the Plan's investment options.

## SUBSTANTIVE ALLEGATIONS

31.     Defendants breached their fiduciary duties by causing the Plan to invest a significant portion of its assets in TEGNA common stock for an unreasonable amount of time following the separation.

## A CHRONOLOGY OF INACTION

32.     At the time of the separation, the Plan held $269 million invested in TEGNA common stock, representing more than 21.7% of the Plan's total assets.  This massive, concentrated holding in a single-stock investment option exposed Plan participant to the risk of large losses that ERISA fiduciaries like the Committee are under a duty to prevent.

33.     In August of 2015, in the course of the Committee's search for a consultant, Committee chair David Harmon and Committee member Minakshi Sundaram received materials from Tejera & Associates, LLC, an investment firm, which specifically noted that the Plan had a "significant holding" in TEGNA stock that was "problematic. . . ."  Letter from M. Tejera to A. Sendowski, August 4, 2015, Gannett-0006204.  Sundaram testified that he received the letter but did not discuss it with any other members of the Committee. Deposition of Minakshi Sundaram, July 13, 2018 ("Sundaram Tr.") at p. 41.

34.     Moreover, in October of 2015, Stuart Potter, who worked for Sundaram, prepared a presentation for Sundaram's immediate supervisor, Gannett's CFO, that listed "Remove TEGNA stock fund" as a "next step" for the Plan.  Gannett-0010036; Gannett-0006398.  However, this presentation was not provided to the Committee.   Other members of the Committee had no knowledge of the EMA or the requirement that the TEGNA Stock Fund be terminated.  Deposition of Committee Member Caryn McGarry, July 18, 2018 ("McGarry Tr.") at 46: 16-20.  Even Committee Chair David Harmon could not recall receiving a copy of the EMA.  Deposition of David Harmon, July 17, 2018 ("Harmon Tr.") at 19: 15-18.

35.     By the end of 2015, more than six months after the spinoff of Gannett, and well over a year after Defendants knew about the separation, Defendants had taken no steps to commence a process for liquidating the TEGNA Stock Fund.  The Committee had met at least five

times, but took no action to even evaluate the continued prudence of the Fund, the performance of TEGNA stock or if it was an appropriate investment for the Plan's participants.  In light of the Committee's inaction, it is unsurprising that the Plan remained heavily invested in TEGNA common stock at the end of 2015, owning more than $178 million in TEGNA common stock. TEGNA common stock was the Plan's largest holding by far. The following table summarizes the Plan's ten largest common stock holdings as of December 31, 2015:

| Company | Vale as of 12/31/15 | % of common stock holdings (including Gannett stock) |
|---|---|---|
| **TEGNA Inc.** | **$178,145,839** | **58.56%** |
| Gannett Co., Inc. | $83,142,323 | 27.33% |
| Amazon.com Inc. | $1,294,329 | 0.43% |
| Visa Inc. | $1,145,103 | 0.38% |
| Facebook Inc. | $939,847 | 0.31% |
| Apple Inc. | $827,344 | 0.27% |
| Royal Dutch Shell Plc (ADRs) | $747,918 | 0.25% |
| Celgene Corp. | $720,716 | 0.24% |
| Nike Inc. Cl B | $694,625 | 0.23% |
| Alphabet Inc. | $694,375 | 0.23% |

36.     To put the Plan's December 31, 2015 holdings of TEGNA common stock in perspective, other than Gannett and TEGNA, the Plan held only approximately $42.9 million in the common stock of all other companies in the world. Accordingly, as of December 31, 2015, **the value of the Plan's TEGNA common stock holdings was 415% greater than the value of all other non-company stock combined.**

37.     By the end of 2015, **TEGNA common stock made up over 80.6% of the Plan's total non-Gannett common stock holdings**. To put this concentration into perspective, other non-company stocks made up on average only 0.18% of total common stock holdings. The next largest non-Company stock, Amazon common stock, made up only 0.43% of total non-Company common stock holdings.

- 10 -

38.     In November of 2015, the Committee hired Towers Watson (now Willis Towers Watson) to provide investment consulting services to the Plan.  During the first Committee meeting that Towers Watson attended on January 26, 2016, the consultant provided a timeline of the projects recommended for completion in 2016, but liquidation of the TEGNA Stock Fund was not included as one of the projects.  Gannett BPC Proposed Project Plan: January 2016, Gannett-0002428-31.

39.     On February 26, 2016, Towers Watson provided fiduciary training for members of the Committee.  Minutes from Committee Meeting on February 26, 2017, Gannett-0002442.  The minutes from this meeting indicate there was a discussion about "best practices in removing . . . spinoff stock from the 401(k)," but no actions were taken at the meeting; nor was there a vote taken for how the TEGNA Stock Fund should be monitored, evaluated or liquidated as the EMA required.

40.     At the Committee's March 26, 2016 meeting, Towers Watson gave a presentation titled "Stock Fund Options in 401(k) Plans: Thoughts and Considerations," that had a section about "Non-Affiliated Single Stock Funds."   Stock Fund Options in 401(k) Plans: Thoughts and Considerations," Gannett-0000450-68.  The presentation mentioned that single stock funds "lack several characteristics that are typical of funds in [Defined Contribution] plan menus which are designed with a view to good governance practices," specifically noting that "[s]ingle company stocks are inherently undiversified, therefore posing unique risks."   Gannett-0000452. The presentation also indicated that it is "difficult to monitor the performance of a single stock fund", noting the difficulty of selecting performance metrics and benchmarks, and recommended that the Committee "seek objective expert financial and legal advice" concerning "whether or not to divest and the timing of divestiture."   Gannett-0000458.   . . . ."   The presentation concluded with

suggestions for possible next steps, including reviewing the purpose of offering the Fund as an investment, hiring an independent fiduciary, considering new procedures for monitoring the Fund and determining whether to liquidate the Fund. *Id.* The presentation did not mention that the EMA mandated liquidation of the TEGNA Stock Fund.

41.     The Committee made no decisions at the March 26, 2016 meeting concerning the TEGNA Stock Fund.

42.     On June 28, 2016, Ernst & Young, LLP, the Plan's independent auditors, warned Gannett that the Plan's TEGNA stock holdings "exposes the Plan to a concentration risk."

43.     In June and July 2016, Potter and Sundaram prepared numerous drafts of a presentation that was ultimately sent to Harmon, Lori Locke, another member of the Committee as well as Gannett's CFO and General Counsel titled "Gannett 401(k) Single Stock Options."  The presentation stated that the Committee and Gannett's management should "evaluate a sunsetting process for eliminating the TEGNA Company Stock Fund."  Gannett 401(k) Single Stock Options," Gannett-0011999.  However, at the remaining Committee meetings in 2016, Towers Watson assisted the Committee on reviewing potential investments and investment managers for the Plan's mutual fund lineup that went into effect on January 31, 2017 even though the TEGNA Stock Fund remained the Plan's largest investment and the price of TEGNA stock had declined by over 30% since the time of the separation.  The changes removed 25 funds from the Plan's investment lineup but did not remove the TEGNA Stock Fund.   Participants were notified about changes to the Plan's investment lineup on December 21, 2016 with a brochure and fund fact sheets of the changes that occurred on January 31, 2017.

44.     The Committee did not consider liquidating the TEGNA Stock Fund in 2016.

45.     Thus, at the end of 2016, more than eighteen months after the separation, the Plan still held a massive amount of TEGNA common stock —more than $115 million. Although the value of the Plan's TEGNA common stock holdings decreased over 2016, a large portion of this decrease was caused by the share price's 16% decrease during 2016 rather than liquidation. The following table summarizes the Plan's ten largest common stock holdings as of December 31, 2016:

| Company | Value as of 12/31/16 | % of common stock holdings (Inc. Gannett stock) |
|---|---|---|
| **TEGNA Inc.** | **$115,658,682** | **52.15%** |
| Gannett Co., Inc. | $64,955,403 | 29.29% |
| Visa Inc. | $904,720 | 0.41% |
| Apple Inc. | $887,181 | 0.40% |
| Amazon.com. | $873,599 | 0.39% |
| JPMorgan Chase & Co. | $848,403 | 0.38% |
| Voya Fin'l Inc. | $817,188 | 0.37% |
| Royal Dutch Shell Plc (ADRs) | $756,383 | 0.34% |
| Citigroup Inc. | $746,560 | 0.34% |
| Morgan Stanley | $714,617 | 0.32% |

46.     To put the Plan's December 31, 2016 holdings of TEGNA common stock in perspective, other than Gannett and TEGNA, the Plan held approximately $41.2 million in common stock. Thus, as of December 31, 2016, **the value of the Plan's TEGNA common stock holdings was 281% greater than the value of all other non-company stock combined.**

47.     **TEGNA common stock made up over 73.75% of the Plan's total non-Gannett common stock holdings**. To put this concentration into perspective, other non-company stocks made up on average only 0.25% of total common stock holdings. The next largest non-Company stock holding, Visa common stock, made up only 0.41% of total non-Company common stock holdings.

- 13 -

48.     In a memorandum dated February 22, 2017 to Gannett's board of directors, Committee Chair David Harmon stated that the Committee had up until that point "handled" the TEGNA Stock Fund by simply having participants sell their shares.  Memorandum from David Harmon to Gannett Board of Directors, Gannett-0002995.  The Committee had not decided to liquidate the TEGNA Stock Fund as the EMA required as of February 22, 2017 – or even started the process to evaluate what liquidating the Fund would involve.

49.     The Committee finally to steps to address the TEGNA Stock Fund in April of 2017, when Towers Watson made a second presentation to the Committee, updating the one it had made to the Committee at the meeting on March 28, 2016.  "Update on Stock Fund Options in 401(k) Plans: Thoughts and Considerations," Gannett-0001270-81.  Tellingly, the "Possible Next Steps for Consideration" in Towers Watson's April 2017 presentation were almost identical to those in its presentation of over a year earlier, indicating that the Committee had effectively wasted a year. The meeting minutes indicate that Towers Watson told the Committee that the TEGNA common stock had a "beta over 1.00", meaning that it had greater price swings in both up and down markets as compared to a diversified index fund, and that "single stock funds do not fit well in Gannett Co., Inc. 401(k)'s new investment lineup…"     In addition to Towers Watson, Evercore Trust Company ("Evercore") also gave a presentation to the Committee about liquidating the TEGNA Stock Fund, noting that "the sunset of a stock fund" would generally not cause an adverse reaction to the stock's price.  Minutes from April 25, 2017 Committee Meeting, Gannett-0001442, 0001443.

50.     Despite these presentations, however, the Committee did not decide to liquidate the TEGNA Stock Fund at the April 2017 meeting, instead delegating to the newly formed "Gannett

401(k) Plan Subcommittee" the tasks of investigating what a plan for sunsetting the TEGNA stock fund would entail.

51.     On June 6, 2017, Potter (the Secretary for the Subcommittee) sent a memorandum to the full committee recommending that the TEGNA stock fund be liquidated twelve months after providing notice to Plan Participants.  Potter's memorandum discussed a number of factors in recommending a twelve-month sunset period.  The memorandum states that a 12-month sunset would "mitigate any potential effect of seasonality" on TEGNA's stock price, although there is no indication the Subcommittee attempted to measure whether the price of TEGNA stock would in fact be affected by seasonality.  The memorandum noted that a 12-month period could potentially reduce the "blackout period," – the time it would take to sell the TEGNA stock of participants who had not sold during the sunset period.  The memorandum also discussed sunsetting a second single-stock fund, this one holding shares of Cars.com that had been issued to Plan Participants in the TEGNA Stock Fund when TEGNA sold Cars.com, and noted that "Cars.com is a new stock fund and participants had not had any time to make their own investment decision."  In contrast, however, the Committee provided Plan Participants with only *two* months to "make their own investment decisions" when the Committee approved the change to its mutual fund investment lineup in 2016.

52.     The Committee approved the Subcommittee's recommendation to liquidate the TEGNA stock fund with a 12-month sunset period on June 8, 2017, but did not hire Evercore to oversee the sunsetting process until July 27, 2017, and Plan Participants were not notified of the decision until July 31, 2017.  In consequence, the TEGNA Stock Fund has not been fully liquidated, even three years after the spinoff of Gannett.  Reasonably prudent fiduciaries should have completed the task within a year.  Accordingly, the Class Period begins on July 1, 2016.

53.     As this chronology makes clear, Defendants felt no urgency to address the single-stock concentration risk posed by the TEGNA stock fund, even though liquidation was mandated by the Plan Sponsor in the EMA.

54.     Committee members appear to have believed that exposing Plan Participants to the concentration risk of a single stock fund was not imprudent so long as participants were able to select other Plan options for their investments.  Sundaram Tr. 82:19-83:16 & 86:2-88:5; Harmon Tr. 38:21-39:14.  Nor did the Committee evaluate the possibility that the Plan's decision to invest in two individual stocks – TEGNA and Gannett – might expose participants to even greater risk, since the performance of the two media company's stocks might be correlated.  Harmon Tr. 77:2-7.

55.     Moreover, the Committee appears to have simply assumed that TEGNA was a prudent investment.  McGarry testified that "There was no reason at that time [after spinoff] to think that it wouldn't be [prudent].  The – it was a company we believe was – had every reason to believe would be successful . . . ."  McGarry Tr. at 22:17-23:1;

56.     The Committee received quarterly reports from Towers Watson on each of the investment options of the Plan.  These were the reports that the Committee used to monitor the prudence of the TEGNA Stock Fund.  Sundaram Tr. at 100:18-103:18; Harmon Tr. 27:14-32:5; McGarry Tr. at 46:21-47:15.  (Q: "So it was just the Towers Watson reports that your remember reviewing?" A: "Yes.").   However, while the Towers Watson quarterly reports provided highly detailed information on the mutual funds in which the Plan was invested, including information about the fund managers, performance relative to established benchmarks over three month and one, three, five and ten year periods, returns versus standard deviations, sector allocation, summary of risk statistics and risk/return statistics, the reports provided ***no*** analysis of the TEGNA stock

fund.  The fund was only listed as an asset of the Plan, with its current market value and a calculation of the percentage of Plan assets invested in it.  *See, e.g.,* Gannett Co., Inc. 401(k) Savings Plan Performance Monitoring Report for Periods Ending March 31, 2016, Gannett_0000631, 0000650.  The Committee thus made no effort to obtain any meaningful information that could be used to assess or monitor the prudence of TEGNA stock.

57.     There was no reason to delay liquidating the TEGNA Stock Fund.  The only rationale for including it as a Plan option in the first place was that Plan Participants had formerly been part of the corporate entity that became TEGNA.  Sundaram testified that the "TEGNA Stock Fund was a legacy stock option that, you know, after the spinoff there were a lot of employees who knew the company well and we see – we saw that that was a big participant interest to have that option in the Plan."  Sundaram Tr. at 54:19-55:2. Potter testified that "there was an affiliation with the former company, people wanted to own TEGNA . . . ."  and that, absent an affiliation with the employer, he would not recommend a single stock as an investment option in a 401(k) plan.  Potter Tr. at 28:13-17 and 33:19-34:4.  McGarry testified that "we felt that people would still want the option to be able to invest in" TEGNA since they had a "close affiliation" with the company.  McGarry Tr. at 22:21-23:6.  Yet the Committee took no steps to ascertain whether this was true.  They did not survey employees (Sundaram Tr. 59:8-22; Harmon Tr. 73:11-13; McGarry Tr. at 34:22-35:6), nor did they attempt to determine whether the large concentration of Plan investment in the TEGNA Stock Fund at the time of the spinoff was the result of the pre-spinoff company's practice of matching employee 401(k) contributions with company stock.  McGarry Tr. 27:13-21 (pre-spinoff, "Old" Gannett match was in company stock); Potter Tr. 29:5-19 (did not know what percentage of TEGNA stock was due to prior company match).  Even if Defendants had verified that employees actually ***wanted*** to invest in TEGNA stock– which they did not – that would not

- 17 -

have provided a basis for concluding that the TEGNA Stock Fund was a prudent option for the Plan.

**THE PLAN'S MASSIVE INVESTMENT IN TEGNA STOCK WAS IMPRUDENT**

58.     The following table summarizes relevant Plan's holdings at the end of 2015 and 2016.

| Value of: | 12/31/15 | 12/31/16 |
|---|---|---|
| TEGNA common stock holdings | $178,145,839 | $115,658,682 |
| Other non-Gannett common stock (combined) | $42,917,175 | $41,173,623 |
| Average of other non-Company stock holdings | $401,095 | $399,744 |

59.     The sheer size of the Plan's holdings in TEGNA common stock was unreasonable by any measure.

60.     According to Morningstar, out of all mutual funds available in the market, the fund with the highest concentration of TEGNA stock was the Cove Street Capital Small Cap Value Fund, which held only 5.8% of TEGNA stock as of December 31, 2017.[1]

61.     Thus, the fact that the Plan as of December 31, 2015 owned ***almost three times*** the concentration of TEGNA stock as the concentrated fund with largest holdings of TEGNA (in relation to total assets) was plainly imprudent for the investment of retirement assets.

62.     The Plan's concentrated position in TEGNA, which represented more than 20% of the Plan's holdings at the time of the separation, exposed it to more "company risk" than undiversified mutual funds who concentrate investments in the common stock of companies in the media industry.   For example, the largest holding of the TRowe Price Media & Telecommunications Fund, a fund which focuses "in the common stock of companies engaged in

---

[1] http://covestreetfunds.com/wp-content/uploads/2018/01/CSC-Q4-2017-Shareholder-Letter.pdf.

any facet of media and telecommunications," was less than 11% of the fund's portfolio as of December 31, 2017. Likewise, Reliance Media & Entertainment Fund's largest investment only represented 13% of its portfolio as of December 31, 2017. The Plan's purpose is to provide participants with retirement income and should not have held a more-concentrated position in one company's stock than non-diverse, sector-specific mutual funds.

63.     The Plan's investment in TEGNA was also grossly disproportionate compared to Gannett's defined benefit plan, the "Gannett Retirement Plan" (the "DB Plan"), which the Committee also administers. The Plan, a defined contribution plan in which the risk of loss is borne by participants, had more than 20% of its assets invested in TEGNA stock at the time of the separation and a 15.8% and 10.7% concentration at the end of 2015 and 2016, respectively. In contrast, the DB Plan, for which Gannett bears the risk of loss, had only 1.8% and 1.7% of its assets invested in TEGNA stock at the end of 2015 and 2016, respectively.

64.     Additionally, the Gannett Plan held significantly more TEGNA common stock *than TEGNA's own 401(k) Plan*. At December 31, 2015 and 2016, the TEGNA 401(k) Plan held only $66.5 million and $58.6 million, respectively. The following table summarizes the Plan's TEGNA common stock holdings in comparison to the TEGNA 401(k) plan:

| Value of TEGNA common stock | 12/31/15 | 12/31/16 |
|---|---|---|
| in Gannett 401(k) Plan ($) | $178,145,839 | $115,658,682 |
| in TEGNA 401(k) Plan ($) | $66,457,269 | $58,592,890 |

65.     Defendants knew about the substantial risk of this lack of diversification. Indeed, the Plan's own auditor warned that the Plan's TEGNA holdings created concentration risk. According to the Plan's 2015 financial statements:

The fair value of the Plan's investment in Gannett's and TEGNA's stock as of December 31, 2015 was approximately $83.1 million and $178.1 million, respectively, **which exposes the plan to concentration risk**. (Emphasis added.)

66.     The following year, the Plan's auditor again warned about the risk created by the large TEGNA common stock holdings. According to the Plan's 2016 financial statements:

The fair value of the Plan's investment in Gannett's and TEGNA's stock as of December 31, 2016 was approximately $65.0 million and $115.7 million, respectively, **which exposes the Plan to concentration risk**. (Emphasis added.)

67.     The overly concentrated position in TEGNA common stock should have been a red flag to the Defendants that they needed to diversify the Plan's assets in order to avoid the risk of large losses and ensure the Plan's assets were invested prudently. Defendants, however, failed to independently assess and monitor the Plan's holdings of TEGNA common stock to ensure they were prudent and that the Plan was reasonably diversified.

68.     Additionally, according to its beta, TEGNA common stock was significantly more volatile, and thus riskier, than other more-suitable investments. Beta is a measure of a stock's volatility in comparison to the volatility of the market as a whole. It is calculated by dividing the covariance of the security's returns and the benchmark's returns by the variance of the benchmark's returns. By definition, the market has a beta of 1.0, and individual stocks are ranked according to how much they deviate from the market. A stock that swings more than the market over time has a beta above 1.0. If a stock moves less than the market, the stock's beta is less than 1.0. High-beta stocks are supposed to be riskier but provide a potential for higher returns; low-beta stocks pose less risk but also lower returns.

69.     At the time of separation, the beta for TEGNA common stock was 1.455 meaning TEGNA was 45.5% more volatile than the stock market. This risk increased toward the end of 2015 when the beta increased to approximately 1.909, meaning TEGNA was 90.9% more volatile than the stock market.

70.     Defendants caused the Plan to hold massive holdings of TEGNA common stock through at least July 31, 2018 and perhaps longer, because Defendants did not follow an appropriate process in evaluating the prudence of TEGNA common stock and the diversification of Plan investment options. Defendants did not perform an independent review, as they were required to do, and their failures cost the Plan participants millions of dollars.

71.     TEGNA common stock was not a "qualifying employer security" for the Plan. ERISA § 404(a)(2), 29 U.S.C. § 1104(a)(2), provides that ERISA's duties of prudence and diversification are not violated "by acquisition or holding of . . . qualifying employer securities."

72.     As of the date of separation, however, TEGNA stock was not a "qualifying employer security" with respect to the Plan.

73.     ERISA § 3(5), 29 U.S.C. § 1002(5) defines "employer" as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan."

74.     ERISA § 407(d)(1), 29 U.S.C. 1107(d)(1), defines "employer security" as a "security issued by an employer of employees covered by the plan, or by an affiliate of such employer." Under ERISA, a "qualifying employer security" is an "employer security" that is either a stock, a marketable obligation (*e.g.*, a bond) or an interest in a publicly traded partnership. See ERISA § 407(d)(5), 29 U.S.C. § 1107(d)(5).

75.     Gannett and TEGNA have been independent companies since they separated in 2015.  The companies have separate defined contribution retirement plans covering their own employees.

76.     TEGNA's employees are not eligible to participate in the Plan.  *See* SPD at p. 2. As part of the Separation, the Plan transferred the account balances for current and former

- 21 -

employees of TEGNA to the "TEGNA 401(k) Savings Plan." "As of the transfer date, employees of TENGA, Inc. and its affiliates ceased participating it the Plan." *See* Plan's 2015 11-k at p. 5.

77.    TEGNA has not paid Plan participants' wages, made contributions to the Plan or otherwise acted in Gannett's interests concerning the Plan since Separation. Accordingly, TEGNA is not an "employer" for the Plan.

78.    TEGNA was also not an "affiliate" of Gannett after the Separation. Under ERISA § 407(d)(7), 29 U.S.C. § 1107(d)(7), a corporation is an "affiliate" of an employer if it is a member of a "controlled group of corporations," a term defined as when a parent corporation owns stock possessing at least 50% of the subsidiary's voting power or when five or fewer individuals, estates or trusts own stock possessing at least 50% of each corporation's voting power. *Id.* (citing 26 U.S.C. § 1563). After the separation, TEGNA and Gannett were both independent, publicly traded companies.  TEGNA is also not among the "Participating Affiliates" listed in the SPD.  *See* SPD at p. 32. Accordingly, the companies have not been "affiliates" since the separation.

79.    As TEGNA was not an "employer" or an "affiliate" for the Plan after the Separation, TEGNA stock was not a "qualifying employer security."  Defendants did ***not*** classify TEGNA stock as an "employer security" in either 2015 or 2016 on the Plan's financial statements.

80.    Defendants had a continuing duty to assess the appropriateness of the Plan's holdings of TEGNA common stock and the TEGNA Stock Fund under *Tibble v. Edison International*, 135 S. Ct. 1823 (2015). As alleged above, Defendants breached their fiduciary duties by allowing the Plan to continue to hold and invest in the TEGNA common stock and the TEGNA Stock Fund.

81.    ERISA requires prudent fiduciaries to diversify the plan's investments "so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."

- 22 -

*See* ERISA § 404(a)(1)(C) [29 U.S.C. § 1104(a)(1)(C)]. ERISA's legislative history indicates that a fiduciary should not invest an "unreasonably large percentage" of plan assets in a "single security," in "one type of security," or in "various types of securities that are dependent upon success of one enterprise or upon conditions in one locality." *See* ERISA Conference Report on H.R. 2, H.R. Rep. No. 1280, 93d Cong., 2d Sess. 300, 304 (Aug. 12, 1974).

82.     Because the value of any single stock is tied to the fortunes of one company, holding a single stock is unduly risky. By contrast, investors who hold a diverse portfolio of stocks and bonds face less risk because they have only a small stake in each company. *See* N. Gregory Mankiw, Principles of Economics 546 (1998); *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 415 (4th Cir. 2007); *Steinman v. Hicks*, 352 F.3d 1101, 1104 (7th Cir. 2003).

83.     Defendants recognized the importance of diversification.  The SPD states that "[s]preading your assets among different types of investments can help (participants) achieve a favorable rate of return, while minimizing (participants') overall risk of losing money." *See* SPD at p. 13.  According to the SPD, retirement savings are not "properly diversified" if more than 20% are invested "in any one company or industry…" *Id.*

84.     Even a 20% concentration in any one company or industry was excessively risky. Under ERISA, the benchmark for the amount of a single security that a retirement plan should own is only 10%, not 20%, as set forth in ERISA 407(a)(2), 29 U.S.C. § 1107(a)(2).

85.     Defendants permitted the Plan to invest far too much in TEGNA stock, as alleged above.  As further alleged above, when combined with the Gannett stock held by the Plan, the holding of TEGNA stock was even more egregiously undiversified because the two securities are in the same industry.

86.     Because of the Plan's concentrated position in TEGNA common stock, numerous other red flags during the relevant period should have demonstrated to Defendants that the Plan should no longer be invested in TEGNA stock.

87.     During 2015 several investment banks downgraded and/or were bearish about TEGNA common stock. For example, Evercore downgraded TEGNA to a "Hold" in July and Jefferies did so in August.

88.     In 2016, several other investment banks likewise downgraded their views on the prospects of TEGNA's common stock. For example, Barclays downgraded TEGNA to "Underweight" in April and JP Morgan downgraded to Neutral in November.

89.     Based on the negative outlook on TEGNA common stock, a prudent and loyal fiduciary would have reviewed the Plan's significant holdings of TEGNA common stock as part of any review and liquidated or significantly reduced such holdings from the Plan if it had not already done so.

90.     Given these risks, coupled with the lack of diversification, Defendants failed to take action that a prudent fiduciary would have taken to stop these losses, and the risk of future large loss, that Plan participants were or could be suffering. Defendants did not liquidate the Plan's holdings of TEGNA common stock or remove the TEGNA Stock Fund as a Plan investment or otherwise act to save the Plan from losing millions of dollars in hard-earned retirement savings.

**DEFENDANTS' IMPRUDENCE CAUSED LOSSES TO THE PLAN**

91.     Unfortunately, the Defendants' breach of their fiduciary duties caused the Plan and its participants to suffer millions of dollars in losses.

- 24 -

92.     The Plan's excessive holdings in TEGNA was costly to participants. For example, the following chart demonstrates the significant decline in the value of TEGNA common stock from the date of separation through the present.



93.     Between the date of the separation through the end of 2015, the price of TEGNA stock fell $3.91 or 19.3%.

94.     During 2016, TEGNA common stock's poor performance continued, losing another $2.64 per share. Thus, from the date of separation through the end of 2016, TEGNA stock fell $6.55 or 32.3%.

95.     The price of TEGNA common stock was relatively flat in 2017, but has dropped significantly in 2018 and is now trading at less than $11 per share.

96.     TEGNA common stock has significantly underperformed the market.  From the date of separation until the present, the price of TEGNA common stock has declined approximately 46% while during that same time period the S&P 500 Index (SPX) has increased approximately 36%.



During the Class Period,  TEGNA stock has declined 27 percent while the S&P 500 increased 34 percent.

97.     The TEGNA Stock Fund also underperformed other investment options in the Plan, including both the Plan's "default option" – a series of target date funds – and Vanguard stock market index funds offered by the Plan.

98.     If Defendants had acted promptly, Plan Participants would have been notified that the TEGNA Stock Fund would be liquidated by no later than January 1, 2016, and Defendants would have closed the Fund and liquidated it six months after that.  If the assets that were in the Fund had been invested in the Plan's default investment options on July 1, 2016, the Plan's assets today would be $43 million greater, and if the Fund's assets were invested in the Vanguard Index Funds offered by the Plan during the Class Period, the Plan would have more than $57 million more in assets today.    Accordingly, the Plan and its participants suffered substantial harm as a result of Defendants' breach of their fiduciary duties.

### DEFENDANTS' FIDUCIARY DUTIES

99.     Under ERISA, those responsible for the management and operation of a plan are fiduciaries and these fiduciaries owe participants the highest duties known to law. These duties

include, among others, the duty of loyalty, the duty of prudence, the duty of diversification, and the duty to monitor. *See* ERISA § 404, 29 U.S.C. § 1104.

100.    <u>Duty of Loyalty</u>. Under ERISA § 404(a)(1)(A)(i) 29 U.S.C. § 1104(a)(1)(A), "a fiduciary shall discharge his duties with respect to a plan **solely in the interest of the participants** and beneficiaries and . . . for **the exclusive purpose of . . . providing benefits to participants** and their beneficiaries." (emphasis added). Thus, a fiduciary must act with one and only one purpose and must act to further one and only one interest. This is often called the "exclusive benefit rule."

101.    <u>Duty of Prudence</u>. Under ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with **the care, skill, prudence, and diligence** under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." (emphasis added).

102.    <u>Duty of Diversification</u>. Under ERISA § 404(a)(1)(C), 29 U.S.C. § 1104(a)(1)(C), "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."

103.    <u>Duty to Monitor</u>. In addition to the duty to prudently select investments, a fiduciary has "a continuing duty of some kind to monitor investments and remove imprudent ones" and "a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

## DEFENDANTS WERE FIDUCIARIES

104.    ERISA requires that every plan name one or more fiduciaries who have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

105.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who perform fiduciary functions for a retirement plan. A person or entity is considered a fiduciary to the extent:

(i)    he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,

(ii)   he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or

(iii)  he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A)(i) [codified at 29 U.S.C. § 1002(21)(A)(i)].

106.    Each of the Defendants was a fiduciary during the Class Period within the meaning of ERISA § 3(21)(A)(i) [29 U.S.C. § 1002(21)(A)(i)] as either a named or a *de facto* fiduciary with respect to the Plan, and each owed fiduciary duties to the Plan and its participants under ERISA.

107.    The Committee and its members are fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised discretionary authority or control over management of the Plan. In particular, they had the fiduciary duty to select and monitor Plan investment options, including the TEGNA stock fund.  The Committee was also the named fiduciary for the Plan.

108.    Gannett is a fiduciary because it had the duty to monitor the Committee to ensure that it was properly meeting its fiduciary duties. It is also a fiduciary because it is responsible for

the acts of the Committee and its members who were acting within the scope of their employment. Gannett was also a *de facto* fiduciary because it shared authority with the Committee to decide if and when the TEGNA Stock Fund should be liquidated.  "Gannett 401(k) Single Stock Options," Gannett-0011986-96.

## CLASS-ACTION ALLEGATIONS

109.    Plaintiff brings this action derivatively on the Plan's behalf pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, and as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of the Plan, Plaintiff, and the following class of similarly situated persons (the "Class"):

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Gannett Co., Inc. 401(k) Savings Plan at any time from July 1, 2016, inclusive (the "Class Period"), and whose Plan accounts included investments in TEGNA common stock (including the TEGNA Stock Fund).

110.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, the Plan had over 15,000 participants at the end of 2016.  Accordingly, Plaintiff believes there are thousands of Plan participants whose Plan accounts included investments in the TEGNA common stock during the Class Period.

111.    Multiple questions of law and fact common to the Class exist, including:

(a)    whether Defendants each owed a fiduciary duty to the Plan, Plaintiff, and members of the Class;

(b)    whether Defendants failed to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries;

(c)     whether Defendants failed to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries with care, skill, prudence, and diligence;

(d)     whether Defendants failed to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries by diversifying the investments of the plan so as to minimize the risk of large losses (unless under the circumstances it is clearly prudent not to do so);

(e)     whether Defendants failed to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries by monitoring investments and removing imprudent ones;

(f)     whether the Plan's massive holdings in TEGNA stock were imprudently undiversified;

(g)     whether TEGNA stock qualified as an Employer Security for purposes of exempting the Plan's holdings in TEGNA stock from the duty to diversify under ERISA § 404;

(h)     whether Defendants otherwise violated ERISA; and

(i)     whether the Plan, Plaintiff, and members of the Class have sustained damages and, if so, what is the proper measure of damages.

112.    Plaintiff's claims are typical of the claims of the members of the Class because the Plan, Plaintiff, and the other members of the Class each sustained damages arising out of Defendants' uniform wrongful conduct in violation of ERISA as complained of herein.

113.    Plaintiff will fairly and adequately protect the interests of the Plan and members of the Class because they have no interests antagonistic to or in conflict with those of the Plan or the Class. In addition, Plaintiff has retained counsel skilled and experienced in class-action litigation, complex litigation, and ERISA litigation.

114.   Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

115.   Class action status is also warranted under Rule 23(b)(1)(A) and (b)(2) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I
### Breaches of Fiduciary Duties
### Violations of ERISA §§ 404 and 409 [29 U.S.C. §§ 1104 and 1109]

116.   Plaintiff incorporates by reference the allegations in the preceding paragraphs.

117.   During the Class Period, the Defendants were named fiduciaries pursuant to ERISA § 402(a)(1) [29 U.S.C. § 1102(a)(1)], or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A) [29 U.S.C. § 1002(21)(A)], or both.

118.   Defendants breached their fiduciary duties by wrongfully allowing the Plan to hold massive amounts of TEGNA common stock.

119.   The scope of the Defendants' fiduciary duties and responsibilities included managing the assets of the Plan for the sole and exclusive benefit of participants and beneficiaries and with the care, skill, diligence, and prudence required by ERISA. Defendants were responsible for, among other things, selecting and offering only prudent investment options, eliminating imprudent options, evaluating the merits of the Plan's investments on an ongoing basis,

administering the operations of the Plan and taking all necessary steps to ensure that the Plan's assets were diversified and invested prudently.

120.     According to Department of Labor regulations and cases interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if he has: (a) given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, and (b) acted accordingly.

121.     Defendants also had a duty to administer the Plan in accordance with the Plan Document. The Plan Document references the EMA which required the liquidation of the TEGNA Stock Fund. Plan Document at Preamble, Gannett-0000151 and EMA at § 5.03(f), Gannett-0002852. The EMA, however, was never distributed at a Committee meeting and a member of the Committee testified that she did not know the EMA existed – much less that it required the liquidation of the TEGNA Stock Fund.

122.     Defendants had a duty to follow a regular, appropriate systematic procedure to evaluate TEGNA common stock as investments in the Plan. They breached that duty and failed to conduct an appropriate investigation of continued investment in TEGNA common stock. For the Plan's mutual fund investment options, the Committee was provided quarterly reports showing each fund's performance and how it compared to the fund's benchmark over numerous time periods. For the TEGNA Stock Fund, however, the quarterly reports *only* stated the total of the Plan's investment in TEGNA stock, and did not state TEGNA stock's price or performance history, or how the stock had performed relative to any benchmark.

123.     As alleged above, Defendants breached their fiduciary duties by failing to diversify Plan investments. Defendants were bound by the duty to diversify the Plan's investments "so as to

minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." *See* ERISA § 404(a)(1)(C), 29 U.S.C. § 1104(a)(1)(C).

124.    Despite the power and ability to do so, Defendants took no actions to diversify the Plan's assets and reduce the Plan's risky investment in TEGNA common stock for over two years after the spinoff, and even then, used an excessively long process for winding down the Fund. Defendants' failure to timely diversify the Plan's assets caused the Plan to suffer tens of millions of dollars in losses during the Class Period.

125.    Additionally, Defendants failed to act prudently when they caused the Plan to continue to hold significant amounts of TEGNA common stock and to offer the TEGNA Stock Fund as Plan investment options because, among other reasons:

(a)    they knew or failed to understand that TEGNA stock was not a qualifying employer security;

(b)    they knew of and/or failed to investigate TEGNA; and

(c)    the risk associated with the investment in TEGNA common stock during the Class Period was by far above and beyond the normal, acceptable risk for retirement plan investments.

126.    Gannett breached its fiduciary duty to monitor the Committee in that it failed to ensure that the Committee followed its fiduciary duties concerning the Plan's investment in TEGNA stock.  Gannett's CFO was told multiple times that the Committee had not liquidated the TEGNA Stock Fund as the EMA required by took no action.  Sundaram and Potter told Gannett's CFO that the Plan should "Remove TEGNA stock fund" and indicated that members of "Gannett management," including Gannett's CFO and general counsel, shared authority with the Committee to decide whether and when the TEGNA Stock Fund should be liquidated.

127.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT II
## Co-Fiduciary Liability
## Violations of ERISA § 405 [29 U.S.C. § 1105]

128.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

129.     ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. Defendants breached all three provisions.

130.     ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by the other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach. As alleged above, each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable effort, to remedy those breaches.

131.     The Committee was the administrator of the Plan.

132.     ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. Defendants knowingly participated in each other's breaches because, as alleged above, they participated in the management of the Plan's improper investment in TEGNA common stock and, upon information and belief, knowingly participated in the improper management of those investments by the other Defendants.

133.    ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

134.    As a direct and proximate result of these breaches of fiduciary duties, the Plan, and indirectly Plaintiff and other participants and beneficiaries, lost millions of dollars of retirement savings.

135.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), each of the Defendants is liable to restore the losses to the Plan caused by his or her breaches of the fiduciary duties and to provide other equitable relief as appropriate.

## CAUSATION

136.    The Plan suffered millions of dollars in losses because Plan assets were imprudently invested TEGNA common stock in breach of the Defendants' fiduciary duties.

137.    Had the Defendants properly discharged their fiduciary duties and/or their co-fiduciary duties, the Plan and its participants would have avoided a substantial portion of the losses suffered through the Plan's continued investment in TEGNA common stock. Defendants should have liquidated (or significantly reduced) the Plan's holdings in TEGNA common stock within a short period following the separation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    A Declaration that the Defendants have breached their ERISA fiduciary duties to the participants;

B.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from their breaches of their fiduciary duties, including loss of vested benefits to the Plan

resulting from imprudent investment of the Plan's assets; to restore to the Plan all profits Defendants made through use of the Plan's assets; and to restore to the Plan all profits which the Plan and participants would have made if Defendants had fulfilled their fiduciary obligations;

C.      An Order enjoining each of the Defendants from any further violations of their ERISA fiduciary obligations;

D.      An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investments;

E.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

G.      An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

H.      An Order for equitable restitution and other appropriate equitable and injunctive relief against all Defendants.

DATED:  January 27, 2022                    Respectfully submitted,


                                            /s/ Gregory Y. Porter
                                            Gregory Y. Porter (VA Bar. No. 40408)
                                            Mark G. Boyko (*admitted pro hac vice*)
                                            BAILEY & GLASSER LLP
                                            1054 31st Street, NW, Suite 230
                                            Washington, DC 20007
                                            (202) 463-2101
                                            (202) 463-2103 fax
                                            gporter@baileyglasser.com
                                            mboyko@baileyglasser.com

Robert A. Izard (*admitted pro hac vice*)
Douglas P. Needham (*admitted pro hac vice*)
IZARD, KINDALL & RAABE, LLP
29 South Main Street, Suite 305
West Hartford, CT 06107
(860) 493-6292
(860) 493-6290 fax
rizard@ikrlaw.com
dneedham@ikrlaw.com

*Attorneys for Plaintiff*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 27, 2022, I caused a copy of the foregoing to be served on

counsel for all parties by filing the foregoing on this Court's CM/ECF system.


*/s/ Gregory Y. Porter*
Gregory Y. Porter