**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| CHRISTINA STEGEMANN, on behalf of the GANNETT CO., INC. 401(k) SAVINGS PLAN and all others similarly situated, | Civil Action No. 1:18-cv-325-AJT-JFA |
| Plaintiff, | |
| vs. | |
| GANNETT CO., INC. and THE GANNETT BENEFIT PLANS COMMITTEE, | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
<u>MOTION FOR SUMMARY JUDGMENT</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ...................................................................................................... 1

II.   UNDISPUTED MATERIAL FACTS ........................................................................ 1

     A.    The Plan and the Gannett/TEGNA Spinoff ................................................. 1

     B.    The TEGNA Stock Fund ............................................................................. 3

     C.    Participant Control Over Plan Assets .......................................................... 7

III.  LEGAL STANDARD .............................................................................................. 8

IV.  ARGUMENT ........................................................................................................... 8

     A.    Plaintiff's claims are precluded by the safe harbor provision of § 404(c). ................. 8

          1.    ERISA § 404(c) applies to Plaintiff's claims. ..................................... 9

          2.    The Plan satisfied the § 404(c) requirements. .................................... 10

               a.    The Plan provided for individual accounts and permitted participants to exercise control over the assets in their accounts.............. 11

               b.    The Plan provided participants with the opportunity to invest their assets across a broad range of investment alternatives. ........................... 15

          3.    Plaintiff exercised independent control over the assets in her account, and her investment outcomes were the result of her investment choices. ......... 17

     B.    Defendants are entitled to summary judgment for the independent reason that the timing and manner of the closure of the TEGNA stock fund was reasonable. ................................................................................................. 18

V.   CONCLUSION...................................................................................................... 21

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Am. Arms Int'l v. Herbert,*
   563 F.3d 78 (4th Cir. 2009) ..................................................................................8

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)..............................................................................................8

*Fifth Third Bancorp v. Dudenhoeffer,*
   573 U.S. 409 (2014)............................................................................................19

*Ghebreab v. Inova Health Sys.,*
   No. 16-cv-1088, 2017 WL 1520427 (E.D. Va. Apr. 26, 2017) ..............................8

*Hughes v. Northwestern Univ.,*
   142 S. Ct. 737 (2022)..............................................................................1, 18, 20

*In re Unisys Sav. Plan Litig.,*
   74 F.3d 420 (3d Cir. 1996).....................................................................................8

*Langbecker v. Elec. Data Sys. Corp.,*
   476 F.3d 299 (5th Cir. 2007) ...............................................................................17

*Lingis v. Motorola, Inc.,*
   649 F. Supp. 2d 861 (N.D. Ill. 2009), *aff'd,* 633 F.3d 552 (7th Cir. 2011) ...........16

*Rogers v. Baxter Int'l, Inc.,*
   710 F. Supp. 2d 722 (N.D. Ill. 2010) ...................................................................16

*Stegemann v. Gannett Co.,*
   970 F.3d 465 (4th Cir. 2020) ............................................................................8, 9

*Vigeant v. Meek,*
   352 F. Supp. 3d 890 (D. Minn. 2018)..................................................................19

**Statutes**

29 U.S.C. § 1104.......................................................................................... *passim*

**Other Authorities**

29 C.F.R. § 2550.404c-1 .............................................................................. *passim*

## I.     INTRODUCTION

The Gannett 401(k) Savings Plan ("the Plan") has always offered Plan participants a diverse set of investment options. This lawsuit challenges the lawfulness of one of those options: the right to retain stock in TEGNA Inc. that plan participants acquired before Gannett Co., Inc. was spun off from TEGNA. Defendants are entitled to summary judgment for two independent reasons:

(1)     Plaintiff's claims are precluded by the safe harbor provision of ERISA § 404(c), 29 U.S.C. § 1104(c), which makes plan participants responsible for their independent investment choices; and

(2)     the Plan fiduciary's decisions to retain and then ultimately close the TEGNA stock fund falls within the "range of reasonable judgments" the Supreme Court has said plan fiduciaries are entitled to make. *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 742 (2022).

## II.     UNDISPUTED MATERIAL FACTS

### A.     The Plan and the Gannett/TEGNA Spinoff

1.     The Plan is a "defined contribution plan" or "individual account plan" within the meaning of ERISA Section 3(34), 29 U.S.C. § 1002(34). *See* Dkt. 95, Amended Complaint ("Am. Compl.") ¶ 27. It is the type of plan commonly known as a 401(k) plan. The Gannett Benefit Plans Committee (the "Committee") administers the Plan as the named fiduciary. *Id.* ¶ 107.

2.     On June 29, 2015, Gannett spun off from TEGNA as a separate, publicly traded company. *Id.* ¶ 21. Before the spinoff, the combined company owned approximately 93 newspapers, including USA TODAY, as well as approximately 46 television stations and digital properties such as the website Cars.com. *See* Ex. 26, TEGNA Press Release; *see also* Ex. 27, USA Today Article (June 1, 2015). The purpose of the spinoff was to unlock the stock price potential in

1

the television and digital properties, which were thought to be weighed down by the legacy newspaper properties. *See* Ex. 28, USA Today Article (June 29, 2015).

3.      Pursuant to the spinoff, TEGNA distributed one share of Gannett common stock for every two shares of TEGNA common stock. *See* Am. Compl. ¶ 21.

4.      The Plan was restated on June 10, 2015 in anticipation of the TEGNA-Gannett spinoff, with Gannett serving as the Plan sponsor effective on the date of the spinoff. *Id.* ¶ 25. The Plan's governing document provided that the TEGNA stock fund would be an investment option that would be frozen to new investments. *See* Ex. 22 ¶ 6.7 & App'x C subsection (r). In other words, the Plan provided that the TEGNA stock fund would remain in the Plan and that, while participants were free to sell the shares they owned, they could not buy additional stock in TEGNA. *Id.* It also provided that any dividends TEGNA paid could not be reinvested in TEGNA stock, but instead would be allocated to other investment funds chosen by participants. *Id.* ¶ 6.7.

5.      The Plan referred to an Employee Matters Agreement between TEGNA and Gannett, noting that it could be used as an interpretive tool with respect to certain transitions. *See* Ex. 18 at 1. The Employee Matters Agreement contemplated that the TEGNA stock fund in the Plan would eventually be closed, but it set no deadline. Instead, it contemplated closure "on such dates and in accordance with such procedures" determined by the Committee. *See id.* ¶ 5.03(g).

6.      During the proposed class period, which began on July 1, 2016, *see* Dkt. 116 at 1, Plan participants could invest their 401(k) money across at least 29 different investment options grouped into six categories: (i) International Equity, (ii) Domestic Equity, (iii) Client Specific Funds, (iv) Balanced, (v) Bond, and (vi) Short-Term Reserves. *See* Ex. 21, Annual Fee Disclosures at 5-9. Funds in these categories were available throughout the alleged class period, although the underlying options changed from time to time. *See id.*; *see also* Ex. 20, Change Fee Disclosure.

### B.    The TEGNA Stock Fund

7.    Before the spinoff, employees were permitted to invest their retirement savings in the TEGNA stock fund. Am. Compl. ¶¶ 3, 25. The pre-spin company matched employees' 401(k) contributions with TEGNA stock. *See id.* ¶ 57.

8.    Plaintiff Christina Stegemann is a participant in the Plan and chose to keep some of her 401(k) assets in the TEGNA stock fund before the spinoff. *Id.* ¶ 14.

9.    After the spinoff, participants who no longer worked for TEGNA (including Plaintiff) could not add more TEGNA stock to their 401(k) accounts, but they were free to sell their TEGNA holdings at any time. *See* Ex. 22, Gannett Co., Inc. 401(k) Savings Plan ¶ 6.7; Ex. 7, Stegemann Dep. at 49:6-12; 50:16-19. Plaintiff understood this at the time of the spinoff. *Id.* She decided to keep her money in the TEGNA stock fund because in her conversations with other employees, she heard that most individuals were keeping their TEGNA stock. *See id.* at 60:23-61:5.

10.    Before and throughout the proposed class period, Defendants warned Plan participants, including Plaintiff, that the TEGNA stock fund was inherently undiversified and therefore riskier than other Plan investment options. *See e.g.,* Ex. 1-6, Plaintiff's Quarterly Statements at 2 ("91% of your portfolio is invested in company stock. A heavy concentration in one company stock may increase the risk of your investments"); Ex. 17, Spin Off Reminder ("All investing is subject to risk, including the possible loss of the money you invest. Because Gannet[t] Stock Fund and TEGNA Stock Fund concentrate on a single stock, they are considered riskier than a diversified stock fund").

11.    The Committee monitored the TEGNA stock fund as well as other investment options offered through the Plan. The Committee met up to nine times per year with outside

consultants, legal counsel, and Gannett employees to discuss the Plan's operations, investments, and investment menu changes. *See*, *e.g.*, Exs. 12, 16, Gannett Benefit Plan Comm. Mins.

12.     Once a quarter, the Committee considered the performance of all investment options in the Plan, including the TEGNA stock fund. *See* Ex. 3, Harmon Dep. at 27:2-5, 29:5-30:4, 43:13-44:5; *see also* Ex. 4, McGarry Dep. at 51:1-5. During most of its meetings, the Committee considered, from a qualitative perspective, whether it made sense to continue offering the frozen TEGNA stock fund. *See* Ex. 5, Potter Dep. at 116:2-117:19. According to one regular attendee at Committee meetings, "[w]e always and continuously were doing analysis on whether to keep the TEGNA Stock Fund." *Id.* at 94; *accord* Ex. 6, Sundaram Dep. at 106:2-106:11 ("the Committee always looked at the performance of the TEGNA Stock Fund and all the other investments"). The two companies remained headquartered in the same building, "[s]o we had a fairly intimate knowledge of what was going on in TEGNA and a comfort level that TEGNA was going to continue to be a viable company." Ex. 5, Potter Dep. at 122:2-11.

13.     In February 2016, at the Committee's behest, the Committee's investment advisor, Willis Towers Watson, discussed the pros and cons of maintaining a legacy stock fund. *See* Ex. 3, Harmon Dep. at 46:4-8; *see also* Ex. 12, 2/26/2016 Gannett Benefit Plan Comm. Mins. On March 28, 2016, the Committee considered a presentation from its investment advisor, "Stock Fund Options in 401(k) Plans/Thoughts and Considerations." *See* Ex. 23, Willis Towers Watson Presentation. The presentation noted the limited legal guidance about what to do with legacy stock funds, the challenges in monitoring such funds, and the potential role of an independent fiduciary in closing the fund—but made no recommendations on when to close the TEGNA stock fund. *Id.* at 9, 14.

14.     In establishing the TEGNA stock fund, the Plan itself noted "the historical relationship" between TEGNA and Gannett, Ex. 22, Gannett Co., Inc. 401(k) Savings Plan ¶ 6.7, and expressly contemplated that the fund would remain one of the options in the Plan. *Id.* & App'x C subsection (r). The Committee also knew that the TEGNA stock fund was frozen to new investments, that TEGNA dividends could not be reinvested in more TEGNA stock, that participants could sell their TEGNA stock whenever they chose, that the rationale for the spinoff was to unlock the stock value of the television and digital properties now owned by TEGNA, that TEGNA appeared to be financially viable and its stock had the potential to rise in value, and that many Plan participants wanted the option of retaining their investments in TEGNA stock. *See* Ex. 3, Harmon Dep. at 39:6-12, 58:1-15, 75:10-19; Ex. 4, McGarry Dep. at 22:3-23:6, 46:4-15; Ex. 6, Sundaram Dep. at 54:9-56:19; Ex. 5, Potter Dep. at 28:1-17, 30:1-21, 35:5-36:22, 125:3-126:16.

15.     At the same time, the Committee understood that the TEGNA stock fund "would be removed at some point in the future." Ex. 5, Potter Dep. at 56:5-21; *accord* Ex. 6, Sundaram Dep. at 136: 15-22. In 2016, TEGNA announced the spinoff of one of its digital properties, Cars.com. *See* Ex. 30, TEGNA 8-K (Cars.com Spinoff Announcement). In light of this second spinoff, the Committee faced the prospect of having two legacy stock funds in the Plan: TEGNA and Cars.com. The Committee created a subcommittee to investigate the possible sunsetting of the TEGNA and Cars.com stock funds. *See* Ex. 6, Sundaram Dep. at 69:13-22, 115:2-16, 135:11-18; Ex. 5, Potter Dep. at 163:3-21, 168:1-169:16.

16.     On May 19, 2017, the subcommittee recommended hiring Evercore as an independent fiduciary to supervise the sunsetting of the TEGNA and Cars.com stock funds. *See* Ex. 33, Potter Memorandum. On June 6, 2017, the Subcommittee discussed the funds at length with representatives from Evercore. *See* Ex. 14, 6/6/2017 Subcommittee Mins. at 1-2; *see also* Ex.

15, 6/6/2017 Evercore Presentation. After considering the effect of inside information and seasonality, weighing the value of participant choice, and factoring in time for participant communication and a responsible liquidation period, the subcommittee recommended sunsetting the stock funds over a 12-month period. *See* Ex. 31, Sunset Memo.

17.     On June 8, 2017, after studying the issue in conjunction with an investment consultant and an independent fiduciary, the Committee followed the subcommittee's recommendation and decided to close the TEGNA stock fund after giving participants a twelve-month sunset period. *See* Ex. 16, 6/8/2017 Committee Meeting Mins.

18.     In a letter dated July 31, 2017, the Committee announced this sunset to Plan participants. The letter read, in relevant part:

> Participants with investments in the TEGNA and Cars.com, Inc. Stock Funds will be provided with a 12 month sunset period to transfer out of the TEGNA and Cars.com, Inc. Stock Funds and into other investment options offered under the Plan. The sunset period is set to expire on or about July 31, 2018, and the TEGNA and Cars.com, Inc. Stock Funds will be eliminated as of such date. If any portion of your balance is still invested in the TEGNA and/or Cars.com, Inc. Stock Funds as of that time, your investments in the TEGNA and/or Cars.com, Inc. Stock Funds will be liquidated in an orderly manner and the proceeds of such sale will be credited to the Vanguard Target Retirement Trust II with the target date closest to the year in which you will reach age 65.

Ex. 36, July 31, 2017 Sunset Notice.

19.     On April 25, 2017, Evercore discussed its role as an independent fiduciary with the Committee. *See* Ex. 37, 4/25/2017 Evercore Presentation; *see also* Ex. 38, 4/25/2017 Committee Meeting Agenda. During this presentation, Evercore stated that it had the "[i]ndustry's largest dedicated staff" and "extensive experience successfully managing stock fund sunsets for leading plan sponsors." *See id.* at 3. Once it was retained, Evercore's contract gave it "exclusive fiduciary authority and responsibility under the Plan and ERISA," with "sole discretion" to decide "whether continuing each Stock Fund as an investment option in accordance with the terms of the Plan prior

6

to the Final Transfer Date is prudent under ERISA." Ex. 25, Evercore Engagement Letter ¶ 4. Evercore's contract also authorized it to liquidate the stock in the TEGNA stock fund if it ever decided that holding the stock was no longer prudent. *Id.* ¶ 5(ii). It never made such a determination. Ex. 2, Cohen Dep. at 98:3-99:18.

20.    Plaintiff chose to sell her TEGNA stock on June 25, 2018—just over a month before the sunset period ended. *See* Ex. 7, Stegemann Dep. at 76:3-7. She reinvested the proceeds in the Vanguard Total Stock Market Index Fund. *See* Ex. 1-11, Plaintiff's Quarterly Statements at 1-2.

21.    The remaining assets of the TEGNA stock fund were liquidated and reinvested in accordance with the sunset plan. The TEGNA stock fund closed for good on August 23, 2018. *See* Ex. 11, Corrected Wagner Report ¶ 82.

### C.    Participant Control Over Plan Assets

22.    The Plan's Summary Plan Description states that the Plan was "intended to qualify as an ERISA Section 404(c) Plan," meaning participants "are solely responsible for [their] investment choices." *See* Ex. 19, Summary Plan Description at 12. Pursuant to that design, participants were regularly provided with information about the Plan's investment menu, their ability to choose how to invest their money, and the risks associated with investing in particular options.

23.    Plaintiff concedes that the Plan permitted her to invest her assets across "at least nine mutual funds and a number of vintages of a target date fund family," Ex. 35, Pl.'s Obj. & Resp. to Defs.' Second Set of Requests for Admission ¶ 1. Plaintiff also admits that the Plan offered a brokerage window through which participants could invest in numerous different mutual funds. *See id*.

24.    Plaintiff visited the Plan's dedicated website to learn more about the Plan a "couple times a year." Ex. 7, Stegemann Dep. 54:23-55:2. She chose to allocate her 401(k) money across

at least seven investment options offered under the Plan and deliberately reallocated her investments both before and during the proposed class period. *See id.* 30:1-7, 42:1-11; 54:23-55:2, 76:3-15.

## III.     LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." *Ghebreab v. Inova Health Sys.*, No. 16-cv-1088, 2017 WL 1520427, at *6 (E.D. Va. Apr. 26, 2017). The Court must view the record "in the light most favorable to the non-moving party," *id.* (citation omitted), but "a scintilla of evidence supporting the [nonmovant's] position will not be enough to over summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also Am. Arms Int'l v. Herbert*, 563 F.3d 78, 82 (4th Cir. 2009). For a genuine issue of material fact to exist, the evidence must be able to support a verdict in favor of the nonmoving party. *Anderson*, 477 U.S. at 248.

## IV.     ARGUMENT

### A.     Plaintiff's claims are precluded by the safe harbor provision of § 404(c).

When a 401(k) plan allows participants to exercise control over the assets in their accounts, ERISA § 404(c) relieves Plan fiduciaries from liability "for *any loss*, or by reason of *any breach*, which results from such participant's or beneficiary's exercise of control." 29 U.S.C. § 1104(c)(1)(A) (emphases added). This safe harbor permits a fiduciary, even one "who is shown to have committed a breach of duty in making an investment decision," to avoid liability "if the alleged loss resulted from a participant's exercise of control." *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 445 (3d Cir. 1996). As the Fourth Circuit explained earlier in this case, "when a fiduciary is sued for breach of a duty that caused a loss to the plan, but some of the loss may have been caused by participants," then "participants 'cannot enjoy their autonomy and [then] blame the [f]iduciaries for declining to second guess that judgment.'" *Stegemann v. Gannett Co.,* 970 F.3d

465, 481 (4th Cir. 2020*)* (quoting *Schweitzer v. Inv. Comm. of Phillips 66 Sav. Plan*, 960 F.3d 190,

199 (5th Cir. 2020)).

          **1.**      **ERISA § 404(c) applies to Plaintiff's claims.**

      Plaintiff has previously argued that § 404(c) cannot apply by virtue of the nature of her claim. Her retained expert, Marcia Wagner (an attorney whose firm, Wagner Law Group, works as Co-Counsel with Plaintiff's counsel on other ERISA matters), intends to offer a legal opinion that § 404(c) "does not provide relief from fiduciary breach claims with respect to losses due to the failure to monitor and remove an inferior investment." *See* Ex 11, Wagner Corrected Expert Report at 21; *see also* Ex. 8, Wagner Dep. at 15:13-16:3, 19:22-20:5. This is incorrect, for two reasons: (1) this argument has already been rejected by the Fourth Circuit in this case, and (2) it is foreclosed by Department of Labor regulations.

      On appeal from this Court's dismissal of the complaint, Plaintiff argued that "it doesn't matter if Defendants can prove the [§ 404(c)] defense or not. It simply does not apply to Plaintiff's claims. Thus," argued Plaintiff, "Defendants' failure to liquidate the TEGNA Stock Fund, despite express warnings that it exposed the Plan to concentration risk, is a breach of their fiduciary duty *even if* individual plan participants had the ability to move their funds out of the Plan." Brief of Appellants at 36, ECF 14, No. 19-1212 (4th Cir. July 2, 2019).

      The Fourth Circuit disagreed and held that as long as the requirements of § 404(c) are satisfied, the defense applies even in the more extreme situation where "the participant instructs the plan trustee to invest the full balance of his account in, e.g., a single stock." *Stegemann*, 970 F.3d at 481. If that happens, the Fourth Circuit said, "the trustee is not to be liable for any loss because . . . the investment does not meet the prudent man standards." *Id*. (quoting *Tatum v. RJR Pension Inv. Comm.* 761 F.3d 346, 356 n.5 (4th Cir. 2014)) (emphasis added). In other words, the Fourth Circuit held that § 404(c) is a valid defense even where a fiduciary has allegedly allowed

an undiversified single stock as an investment option. Plaintiff has admitted as much: In opposing Defendants' unsuccessful petition for certiorari to the U.S. Supreme Court, Plaintiff admitted that the Fourth Circuit had rejected her argument, "leaving Gannett free to assert its [§ 404(c) defense] on remand." Brief in Opp'n at 3, *Gannett Co. v. Quatrone*, No. 20-609 (Mar. 5, 2021).

Plaintiff's argument is also contradicted by the governing regulations. The regulations provide several examples demonstrating when § 404(c) protects plan fiduciaries, and one is directly on point. In Example 5, the regulation outlines the following situation:

> A participant, P, independently exercises control over assets in his individual account plan by directing a plan fiduciary, F, to invest *100% of his account balance in a single stock*. P is not a fiduciary with respect to the plan by reason of his exercise of control *and F will not be liable for any losses that necessarily result from P's investment instruction.*

29 C.F.R. § 2550.404c-1(f)(5) (emphases added). Plaintiff's theory here is that the TEGNA stock fund was imprudent because it was undiversified. Brief in Opp'n at 3, *Gannett Co. v. Quatrone*, No. 20-609 (Mar. 5, 2021). But Example 5 from the Department of Labor regulation shows that § 404(c) applies, and the fiduciary is not liable, even in the extreme scenario where ***100 percent of a participant's account balance is invested in a single stock***.

## 2.    The Plan satisfied the § 404(c) requirements.

The § 404(c) safe harbor applies where (1) the plan "provides for individual accounts and permits a participant or beneficiary to exercise control over the assets in his account," and (2) the "participant or beneficiary exercises control over the assets in his account (as determined under regulations of the Secretary)." 29 U.S.C. § 1104(c)(1)(A). Department of Labor regulations list more detailed requirements. A plan must provide the opportunity to (1) exercise control over assets in her individual account, and (2) choose, from a broad range of investment alternatives, the manner in which some or all of the assets in her account are invested. 29 C.F.R. § 2550.404c-1(b)(1)(i)-(ii).

a.   **The Plan provided for individual accounts and permitted participants to exercise control over the assets in their accounts.**

There is no dispute that the Plan provided for individual accounts, thus satisfying the "individual account" requirement of § 404(c)(1). Dkt. 95 ¶ 27. The Plan also gave participants the opportunity to "exercise control over assets in [her] individual account," as required by § 404(c)(1) and 29 C.F.R. § 2550.404c-1(b)(1)-(2).

To begin, the Plan provided participants with "reasonable opportunity to give investment instructions . . . to an identified plan fiduciary who is obligated to comply with such instructions," except in narrow circumstances. 29 C.F.R. § 2550.404c-1(b)(2)(i)(A); *See* Ex. 21, Annual Fee Disclosures at 1-3; *see also* Ex. 19, Summary Plan Description at 12.

The Plan also provided "the opportunity to obtain sufficient information to make informed investment decisions with regard to investment alternatives available under the plan." 29 C.F.R. § 2550.404c-1(b)(2)(i)(B).[1] Participants were given, among other information:

- "An explanation that the plan is intended to constitute a plan described in [§ 404(c) and its accompanying regulations], and that the fiduciaries of the plan may be relieved of liability for any losses which are the direct and necessary result of investment instructions given by such participant or beneficiary," 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(1), *see* Ex 19, Summary Plan Description at 12;

- "A description of the procedures established to provide for the confidentiality of information relating to the purchase, holding and sale of employer securities, and the exercise of voting, tender and similar rights, by participants and beneficiaries, and the name, address and phone number of the plan fiduciary responsible for monitoring compliance with the procedures," 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(3), *see id.;*

---

[1] The recordkeeper for the Plan, Vanguard, tailored its participant communications to satisfy the requirements of § 404(c) and its associated regulations. For a summary of these participant-facing communications, *see* Ex. 32, Vanguard Service Administration Manual at GANNETT-0012449-50.

- All of the disclosures that 29 C.F.R. § 2550.404a-5[2] requires be provided "on or before the date on which a participant or beneficiary can first direct her investments and at least annually thereafter,"[3] namely:

  o "An explanation of the circumstances under which participants and beneficiaries may give investment instructions;" *see* Ex. 21, Annual Fee Disclosures at 1-3.

  o "An explanation of any specified limitations on such instructions under the terms of the plan, including any restrictions on transfer to or from a designated investment alternative;" *see id.*

  o "A description of or reference to plan provisions relating to the exercise of voting, tender and similar rights appurtenant to an investment in a designated investment alternative as well as any restrictions on such rights;" *see id.* at 2; Ex. 34 Declaration of Stuart Potter ("Potter Decl.") ¶ 5 (describing the extent to which voting, tender, and similar rights were passed through to Plan participants).

  o "An identification of any designated investment alternatives offered under the plan;" *see* Ex. 21, Annual Fee Disclosures at 5-9.

  o "An identification of any designated investment managers;" *see id.*

  o "A description of any 'brokerage windows,' 'self-directed brokerage accounts,' or similar plan arrangements that enable participants and beneficiaries to select investments beyond those designated by the plan;" *see id.* at 2.

  o "An explanation of any fees and expenses for general plan administrative services . . . which may be charged against the individual accounts of participants and beneficiaries and are not reflected in the total annual operating expenses of any designated investment alternative, as well as the basis on which such charges will be allocated;" *see* Ex. 20, Change Fee Disclosure at 2.

  o "An explanation of any fees and expenses that may be charged against the individual account of a participant or beneficiary on an individual, rather than on a plan-wide, basis . . . and which are not reflected in the total annual

---

[2] 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(2) incorporates the information required by 29 C.F.R. § 2550.404a-5.

[3] The Plan did not offer designated investment alternatives with fixed returns or annuities guaranteed by insurance companies. Ex. 34, Potter Decl. ¶ 5. Disclosures that only apply to those sorts of investment options (e.g., the disclosures described in 29 C.F.R. § 2550.404a-5(d)(1)(ii)(B)) are therefore excluded from this list.

operating expenses of any designated investment alternative;" *see* Ex. 21, Annual Fee Disclosures at 3-4; Ex. 34, Potter Decl. ¶ 5.[4]

o Identifying information for each designated investment alternative offered under the plan, including their names and types or categories of investments;[5] *see* Ex. 21, Annual Fee Disclosures at 5-9.

o Performance data for each designated investment alternative listing "the average annual total return of the investment for 1–, 5–, and 10–calendar year periods (or for the life of the alternative, if shorter) ending on the date of the most recently completed calendar year; as well as a statement indicating that an investment's past performance is not necessarily an indication of how the investment will perform in the future;" *see id.*

o Benchmark information for each designated investment alternative, including "the name and returns of an appropriate broad-based securities market index over the [comparable time periods], and which is not administered by an affiliate of the investment issuer, its investment adviser, or a principal underwriter, unless the index is widely recognized and used;" *see id.*

o Fee and expense information for each designated investment alternative listing (i) "[t]he amount and a description of each shareholder-type fee . . . and a description of any restriction or limitation that may be applicable to a purchase, transfer, or withdrawal of the investment in whole or in part;" (ii) "[t]he total annual operating expenses of the investment expressed as a percentage (i.e., expense ratio);" (iii) "[t]he total annual operating expenses of the investment for a one-year period expressed as a dollar amount for a $1,000 investment;" (iv) "[a] statement indicating that fees and expenses are only one of several factors that participants and beneficiaries should consider when making investment decisions;" and (v) "[a] statement that the cumulative effect of fees and expenses can substantially reduce the growth of a participant's or beneficiary's retirement account and that participants and beneficiaries can visit the Employee Benefit Security Administration's Web site for an example demonstrating the long-term effect of fees and expenses;" *see id.* at 1, 5-9

o A website address that is "sufficiently specific to provide participants and beneficiaries access to" (i) the name of each designated investment

---

[4] Some individual fees and expenses listed as examples in the regulation (e.g., fees for investment advice) were never imposed by the Plan between July 1, 2016 and the closure of the TEGNA stock fund and are therefore inapplicable here. *See* Ex. 34, Potter Decl. ¶ 5.

[5] All information disclosed in accordance with 29 C.F.R. § 2550.404a-5(d)(1) is expressed in the comparative format prescribed by 29 C.F.R. § 2550.404a-5(d)(2). *See* Ex. 21, Annual Fee Disclosures at 5-9.

alternative's issuer; (ii) each alternative's objectives or goals; (iii) each alternative's principal strategies and risks; (iv) each alternative's portfolio turnover rate; (v) each alternative's performance data; and (vi) each alternative's fee and expense information; *see id.* at 9; Ex. 32, Vanguard Service Administration Manual at GANNETT-0012449-50; Ex. 7, Stegemann Dep. at 54:19-55:2.

  o "A general glossary of terms to assist participants and beneficiaries in understanding the designated investment alternatives, or an Internet Web site address that is sufficiently specific to provide access to such a glossary along with a general explanation of the purpose of the address;" *see* Ex. 21, Annual Fee Disclosures at 9.

- The disclosures that 29 C.F.R. § 2550.404a-5 requires be provided between 30 and 90 days before the effective date of a change to plan-related information; *see* Ex. 20, Change Fee Disclosure; Ex. 24, Summary of Material Modifications.

- The disclosures that 29 C.F.R. § 2550.404a-5 requires be provided at least quarterly, namely:

  o A statement of administrative expenses that includes "(A) [t]he dollar amount of the fees and expenses . . . actually charged . . . during the preceding quarter to the participant's or beneficiary's account for such services; (B) [a] description of the services to which the charges relate . . . ; and (C) [i]f applicable, an explanation that . . . some of the plan's administrative expenses for the preceding quarter were paid from the total annual operating expenses of one or more of the plan's designated investment alternatives (e.g., through revenue sharing arrangements, Rule 12b–1 fees, sub-transfer agent fees);" *see* Ex. 1, Plaintiff's Quarterly Statements at 1, 3.

  o A statement of individual expenses that includes "[t]he dollar amount of the fees and expenses" actually charged and "[a] description of the services to which the charges relate;" *see id.* at 3.

- The disclosures 29 C.F.R. § 2550.404a-5 requires after investment in a designated investment alternative, namely "any materials provided to the plan relating to the exercise of voting, tender and similar rights appurtenant to the investment, to the extent that such rights are passed through to such participant or beneficiary under the terms of the plan;" *see* Ex. 21, Annual Fee Disclosures at 1-2.

Had Plaintiff requested, Defendants would have supplied her with the additional disclosures listed under 29 C.F.R. § 2550.404a-5(d)(4). *See* Ex. 21, Annual Fee Disclosures at 1; *see also* Ex. 19, Summary Plan Description at 28.

There is no genuine dispute that participants were provided with and had the opportunity to obtain "sufficient information to make informed investment decisions with regard to investment alternatives available under the plan," including as to the risk of loss of investment in the TEGNA stock fund. *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B). Participants were provided detailed information about the Plan's investment options through multiple sources, including the Summary Plan Description, Annual Fee Disclosures, Quarterly Account Statements, and a variety of online resources. *See* Ex. 19, Summary Plan Description; Exs. 21, Annual Fee Disclosures; Ex. 1, Plaintiff's Quarterly Statements.

In addition, Plaintiff was repeatedly reminded of the risk of investing a large percentage of her 401(k) account in TEGNA stock. *See, e.g.,* Ex. 1, Plaintiff's Quarterly Statements at 7, 11, 15, 19, 23, 30, 34, 38, 42, 45, 49, 53, 60, 64, 67, 71, 75. The statements listed the exact percentage of Plaintiff's portfolio invested in company stock and warned: "A heavy concentration in one company stock may increase the risk of your investments." *See id.* at 8, 15, 28, 35, 41, 54, 60. Plaintiff's statements also included a "recommendations" section, which emphasized the risks of concentration in company stock. *See id.* at 11, 19, 34, 42, 49, 64, 71.

### b. The Plan provided participants with the opportunity to invest their assets across a broad range of investment alternatives.

A Department of Labor regulation, 29 C.F.R. § 2550.404c-1(b)(3), lists the criteria a plan's investment menu must meet to qualify as "a broad range of investment alternatives" under § 404(c). The plan must offer with a reasonable opportunity to:

(A) Materially affect the potential return on amounts in his individual account with respect to which he is permitted to exercise control and the degree of risk to which such amounts are subject;

(B) Choose from at least three investment alternatives:

(1) Each of which is diversified;

(2) Each of which has materially different risk and return characteristics;

(3) Which in the aggregate enable the participant or beneficiary by choosing among them to achieve a portfolio with aggregate risk and return characteristics at any point within the range normally appropriate for the participant or beneficiary; and

(4) Each of which when combined with investments in the other alternatives tends to minimize through diversification the overall risk of a participant's or beneficiary's portfolio;

(C) Diversify the investment of that portion of his individual account with respect to which he is permitted to exercise control so as to minimize the risk of large losses, taking into account the nature of the plan and the size of participants' or beneficiaries' accounts. In determining whether a plan provides the participant or beneficiary with a reasonable opportunity to diversify his investments, the nature of the investment alternatives offered by the plan and the size of the portion of the individual's account over which he is permitted to exercise control must be considered. Where such portion of the account of any participant or beneficiary is so limited in size that the opportunity to invest in look-through investment vehicles is the only prudent means to assure an opportunity to achieve appropriate diversification, a plan may satisfy the requirements of this paragraph only by offering look-through investment vehicles.

29 C.F.R. § 2550.404c-1(b)(3)(i).

The Plan provided participants the opportunity to choose from a "broad range of investment alternatives." 29 C.F.R. § 2550.404c-1(b)(3). *See generally* Ex. 9, Report of Kelly Driscoll at 22-23. During the relevant period, the Plan offered at least 24 investment options, the vast majority of which were diversified. *See* Ex. 21, Annual Fee Disclosures at 5-9. The investment menu allowed participants to diversify as they saw fit across a wide set of risk/return options in categories including International Equity, Domestic Equity, Client Specific Funds, Balanced, Bond, and Short-Term Reserves. *See id.* Substantially more limited investment menus have been found broad enough to meet the 404(c) test. *See Lingis v. Motorola, Inc.*, 649 F. Supp. 2d 861 (N.D. Ill. 2009) (nine investment alternatives), *aff'd*, 633 F.3d 552 (7th Cir. 2011); *Rogers v. Baxter Int'l, Inc.*, 710 F. Supp. 2d 722, 730 (N.D. Ill. 2010) (seven alternatives).

### 3. Plaintiff exercised independent control over the assets in her account, and her investment outcomes were the result of her investment choices.

Section 404(c) "places responsibility for the success or failure of a participant's investments on his own choices." *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 309 (5th Cir. 2007). Plaintiff cannot reasonably dispute that she exercised independent control over her assets.

At the time of the 2015 spinoff, Plaintiff had invested her 401(k) assets across the TEGNA and Gannett stock funds, a "Stable Value Fund," a "Balanced Fund," a "Large Cap Value Fund," a "Large Cap Growth Fund," and a "2030 Retirement Fund." Ex. 1, Plaintiff's Quarterly Statements at 4. She made these investment choices because she "thought it was a good idea not to put all my eggs in one basket and spread it out to different areas." Ex. 7, Stegmann Dep. at 30:1-7. Plaintiff admits that she made her allocation decisions as a result of "[t]hrowing a dart at a dartboard," *id.* at 42:11, but Plaintiff – not Defendants—threw the darts. Plaintiff stayed up to date on her account's performance by looking at her quarterly statements, *id.* at 33:22-34:4, and reviewing the Vanguard website. *Id.* at 54:23-55:2.

Plaintiff understood that she was free to sell her TEGNA holdings at any time, *id.* at 50:16-20, but chose to maintain that investment for almost three years after the spinoff, until June 25, 2018, *id.* 76:3-7. On that date, Plaintiff sold her TEGNA holdings and moved the proceeds into a Vanguard Total Stock Market Index Fund. Ex. 1-11, Plaintiff's Quarterly Statements at 1-2. Plaintiff made this decision after discussing investment strategies with her stepfather. Ex. 7, Stegemann Dep. at 76:19-21. She chose to sell her TEGNA stock before the end of the sunset period because she wanted to continue to exercise control over her the assets in her account: she did not trust the Committee to reinvest her TEGNA holdings. *Id.* at 76:8-15.

17

In short, the Plan empowered Plaintiff to exercise control of her own retirement savings and invest her assets as she saw fit. Plaintiff exercised this power both before and during the proposed class period, after being repeatedly warned about the risks of investing in TEGNA or any other single-company stock. In short, her investment outcomes resulted from her own decisions.

Example 5 of the § 404(c) regulations, discussed above, cements this conclusion. Under Example 5, a participant in a § 404(c) plan exercised control to the point that ***100% of his account balance*** was invested in a single stock. Even assuming that the complete lack of diversification under that scenario is imprudent, the regulations provide that the fiduciary "will not be liable for any losses that necessarily result from" the participant's exercise of control. 29 C.F.R. § 2550.404c-1(f)(5). The same is true here.

### B.   Defendants are entitled to summary judgment for the independent reason that the timing and manner of the closure of the TEGNA stock fund was reasonable.

ERISA imposes a duty on plan fiduciaries to act "solely in the interest of the participants and beneficiaries" and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). The Supreme Court recently emphasized that there is rarely one correct decision fiduciaries can make in any given situation. Instead, they can employ a "range of reasonable judgments," and courts should give due regard to those choices. *Hughes*, 142 S. Ct. at 742.

The issue before the Court is a narrow one. The TEGNA stock fund was closed in 2018, so there is no question about whether it was appropriate to close the fund at some point. Nor is the question whether the Committee used a prudent process to close it: Plaintiff's expert, Marcia Wagner, admitted that she sees nothing wrong with how the Committee ultimately went about

closing the TEGNA stock fund. Ex. 8, Wagner Dep. at 63:24-65:18, 103:11-19. The only question is timing. Plaintiff's expert claims it took the Committee too long to announce the closure of the TEGNA stock fund (roughly two years after the spinoff; Plaintiff's expert says it should have taken no more than six months), and that it provided too long of a sunset period (twelve months; she says it should have taken no more than six). *See id.* at 49:19-50:20, 89:23-90:5.

Plaintiff's entire theory is based on arbitrary Monday-morning quarterbacking. To begin, her putative expert has no experience—none—in advising 401(k) plans about how quickly they should announce the closure of a legacy stock fund. Ex. 8, Wagner Dep. at 43:14-44:14, 155:12-15. Wagner points to the Employee Matters Agreement, which contemplated the closure of the TEGNA stock fund, *id.* at 47:13-48:16, 51:12-18, but even if the Agreement was binding on the Committee (it was not a party to it), it was conspicuously silent about **when** the TEGNA stock fund should be closed. *Id.* at 57:22-58:1; *see also* Ex. 18, Employee Matters Agreement ¶ 5.03(g). Instead, with respect to timing, it deferred entirely to the Committee's judgment. The Agreement cannot support the urgency Wagner perceives in it.

Wagner also points to the decline in TEGNA's stock price after the spinoff. But the Supreme Court has made clear that mere stock price fluctuations are not sufficient to establish imprudence, because fiduciaries are not required to predict that the market is over or undervaluing a stock. *See Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 426 (2014) (rejecting sufficiency of allegation that stock was imprudent because its price was declining); *see also Vigeant v. Meek*, 352 F. Supp. 3d 890, 898 (D. Minn. 2018) (no imprudence despite a 50% stock price decline). When the well-respected independent fiduciary Evercore took charge of the TEGNA stock fund during the sunset period, it told participants that it would not close the fund in response to ordinary fluctuations in stock price. *See* Ex. 36, Sunset Memo at 3.

In contrast to Wagner, Defendants' expert, Kelly Driscoll, has extensive experience with the sunsetting of legacy stock funds. In her experience, plan fiduciaries regularly wait as long as the Committee did (or longer) to announce the closure of legacy stock. *See* Ex. 9, Driscoll Rpt. at 10. Publicly available data supports this conclusion. Between 2008 and 2018, the average length of time from spinoff to closure of a legacy stock fund was 33 to 37 months—consistent with the timing of the closure of the TEGNA stock fund. *See* Ex. 10, Marietta-Westberg Rpt. ¶ Ex. 3 at 1.

In addition, before it began the closure process in the spring of 2017 (less than two years after the spinoff), the Committee knew that the whole point of the Gannett/TEGNA spinoff was to unlock the value of the television and digital properties that became TEGNA properties; that some participants, in light of their knowledge of TEGNA and the historical relationship between the two companies, wanted to keep their money in the TEGNA stock fund; that the TEGNA stock fund was closed to new investments; and that participants were free to take their money out of that fund at any time. *See supra* at 1-5 (¶¶ 2, 4, 12, 15). These factors persuaded the Committee that the frozen TEGNA stock fund remained a prudent option, and it discussed that topic at most of its meetings. *See supra* at 4-5 (¶¶ 12, 14-15). This decision and the process supporting it were easily within the range of reasonable judgments fiduciaries can make. *See generally* Ex. 9, Driscoll Rpt. at 15-22; *see also Hughes*, 142 S. Ct. 742.

The Committee decided to pursue closure of the TEGNA stock fund after the Cars.com spinoff was announced, creating the prospect of not one but two legacy stock funds in the Gannett Plan. *See supra* ¶ 15. The Committee decided to close both funds (TEGNA and Cars.com) after a deliberate process that, as noted above, Plaintiff's expert has conceded was prudent. Ex. 8, Wagner Dep. at 63:24-65:18, 103:11-19.. Among other things, the Committee created a 401(k) subcommittee charged with recommending whether to sunset the TEGNA and Cars.com stock

funds. *See* Ex. 13, 4/25/2017 Committee Meeting Mins. The subcommittee recommended hiring Evercore as independent fiduciary for both stock funds, having evaluated Evercore and one of its competitors across numerous criteria. *See* Ex. 33, Potter Memorandum. The subcommittee discussed the stock funds at length with Evercore, which presented data showing that 47 percent of its clients used sunset periods of twelve months or more. *See* Ex. 14, 6/6/2017 Subcommittee Mins. at 1-2; *see also* Ex. 15, 6/6/2017 Evercore Presentation at 5. After considering a variety of factors, the subcommittee recommended sunsetting the TEGNA and Cars.com stock funds over a 12-month period. *See* Ex. 31, Sunset Memo. Two days later, the Committee approved this recommendation. *See* Ex. 16, 6/8/2017 Gannett Benefit Plans Comm. Meeting Mins.

Plaintiff contends that the sunset period should have been six months rather than twelve, Wagner Rpt. ¶ 80, but this is an arbitrary *ipse dixit*. *See* Ex. 9, Driscoll Rpt. at 17-18. Evercore's data showed that more plans used a twelve-month sunset period rather than a six-month period, and some had even longer sunset periods. *See* Ex. 15, 6/6/2017 Evercore Presentation at 5. The Committee chose the twelve-month period after considering the factors fiduciaries typically consider when making such choices. See Ex. 31, Sunset Memo at 1-2. And the prudence of the length of the sunset period was confirmed when Evercore took over as an independent fiduciary, with full authority to accelerate the process if it determined that the TEGNA stock fund was no longer prudent. *See* Ex. 25, Evercore Engagement Letter ¶¶ 4, 5. It never made such a determination, Ex. 2, Cohen Dep. at 98:3-99:18, and the fund was closed as planned in August 2018. *See* Ex 11, Wagner Corrected Expert Report ¶ 82.

## V.   CONCLUSION

For the reasons set forth above, the Court should grant Defendants' Motion for Summary Judgment, enter judgment in favor of Defendants, and award Defendants any other appropriate relief.

Dated: May 27, 2022                    Respectfully submitted,

                                       GANNETT CO., INC. and THE GANNETT
                                       BENEFIT PLANS COMMITTEE

                                       */s/ Laurin H. Mills*
                                       Laurin H. Mills (VA Bar No. 79848)
                                       laurin@samek-law.com
                                       SAMEK WERTHER MILLS, LLC
                                       2000 Duke Street, Suite 300
                                       Alexandria, VA 22314
                                       Tel: 703-547-4693

                                       Eric S. Mattson (admitted *pro hac vice*)
                                       emattson@sidley.com
                                       Joshua H. Harris (admitted *pro hac vice*)
                                       joshua.harris@sidley.com
                                       Tommy Hoyt (admitted *pro hac vice*)
                                       thoyt@sidley.com
                                       SIDLEY AUSTIN LLP
                                       One S. Dearborn Street
                                       Chicago, IL 60603
                                       Tel: 312-853-7000

                                       *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 27, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following:

Gregory Y. Porter
Mark G. Boyko
BAILEY & GLASSER LLP
1054 31st Street, NW, Suite 230
Washington, DC 20007
gporter@baileyglasser.com
mboyko@baileyglasser.com

Robert A. Izard
Douglas P. Needham
IZARD, KINDALL & RAABE, LLP
29 South Main Street, Suite 305
West Hartford, CT 06107
rizard@ikrlaw.com
dneedham@ikrlaw.com

/s/ Laurin H. Mills
Laurin H. Mills