IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| Christina Stegemann, on behalf of GANNETT CO., INC. 401(k) SAVINGS PLAN and all others similarly situated, <br><br> *Plaintiff*, <br><br> v. <br><br> GANNETT CO., INC *et al.*, <br><br> *Defendants*. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) )   Civil Action No. 1:18-cv-325 (AJT/JFA) |

## **MEMORANDUM DECISION AND ORDER**

Plaintiff Christina Stegemann ("Plaintiff"), on behalf of a class, (collectively, "Plaintiffs") alleges that Defendants were fiduciaries of the TEGNA Stock Fund, an investment option within an ERISA-governed 401(k) savings plan, which consisted mostly of legacy company stock, and that Defendants breached their duties of prudence and diversification in violation of 29 U.S.C. § 1104(a)(1)(B) and § 1104(a)(1)(C) when they failed to liquidate the TEGNA Stock Fund by mid-August of 2016, about two years before the fund was actually liquidated on August 23, 2018. *See* [Doc. No. 171] (Apr. 25, 2023 (P.M.) Trial Tr.) at 168:1–169:21; *see also* [Doc. No. 173] (Apr. 26, 2023 (P.M.) Trial Tr.) at 498:4–10. Defendants contend that they discharged all their fiduciary duties to monitor and proceed in a prudent manner with respect to the liquidation of the TEGNA Stock Fund. A three-day bench trial began on April 25, 2023, and the Parties submitted proposed findings of fact and law on June 2, 2023. [Doc. No. 182] (Defs.' Findings of Fact and Conclusions of Law); [Doc. No. 183] (Plfs.' Findings of Fact and Conclusions of Law).

1

The Court has reviewed the evidence presented, including the trial exhibits and the expert and other witness testimony. With respect to the testimony of any particular witness, including the expert witnesses offered by the Parties, the Court has considered the credibility of those witnesses and the weight to be given to their testimony in light of the underlying facts relied on to support their testimony. After consideration of the Parties' positions, the undisputed facts, and all of the evidence and testimony presented, the Court finds and concludes that Plaintiffs have failed to establish by a preponderance of the evidence that Defendants breached either their duty of prudence in violation of 29 U.S.C. § 1104(a)(1)(B), or their duty to diversify in violation of 29 U.S.C. § 1104(a)(1)(C). Judgment will accordingly be entered in favor of Defendants, and in support of that verdict, the Court states the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## I.   FINDINGS OF FACT

**A.  The TEGNA Stock Fund was created as the result of a company spin-off.**

1. Gannett Co., Inc. ("Predecessor Gannett") sponsored a defined contribution retirement savings plan (a "401(k)") for its employees within the meaning of ERISA, 29 U.S.C. § 1002. [Doc. No. 146] (Stipulation of Uncontested Facts) ¶ 1. The defined contribution plan was called the Gannett 401(k) Savings Plan (the "Plan"). *Id.*

2. Predecessor Gannett offered as an investment option within the Plan a fund consisting entirely of Predecessor Gannett common stock. Predecessor Gannett employees also received Predecessor Gannett common stock through a 401(k) contribution "match," and employees could retain the stock or sell it and reinvest the proceeds in other assets available as investment options in the Plan. [Trial Ex. 93] (Gannett Summary Plan Description) at 8 ("In general, the Company's matching contribution will be made to the Gannett Stock Fund in the form of Gannett stock. You

have the flexibility to transfer all or a portion of the Company's matching contribution at any time to any other investment fund available").

3. On August 5, 2014, Predecessor Gannett announced that its Board of Directors (the "Board") approved the spin-off of its publishing segment into a new, independent, and publicly-traded company that would continue to use the Gannett name ("Successor Gannett" or "Gannett Co., Inc.," a Defendant in this case). [Doc. No. 107] (Defs.' Answer) ¶ 20. After the spin-off, what remained of Predecessor Gannett held primarily television and digital properties and was renamed TEGNA, Inc. ("TEGNA"). [Doc. No. 146] ¶ 6; [Doc. No. 107] ¶ 21.

4. Pursuant to the terms of the spin-off, Predecessor Gannett stockholders, including Plan participants, would receive one share of Successor Gannett common stock for every two shares of TEGNA common stock. [Doc. No. 146] ¶ 7. As a result, Plan participants who invested some of their funds in Predecessor Gannett would receive Successor Gannett *and* TEGNA stock upon the spin-off in those proportions. *Id*. at ¶ 12.

5. Under a June 10, 2015 restatement of the Plan (the "Governing Document"), Successor Gannett was designated as the Plan sponsor as of the date of the spin-off. *Id.* at ¶ 9; [Trial Ex. 96] at 1. Predecessor Gannett was the settlor of the Plan, and in that capacity prepared the Governing Document. [Trial Ex. 96]; *see also* [Doc. No. 171] at 164:10–17.

6. The Governing Document provides for the creation of two investment funds to hold single-stock assets for the stock holdings resulting from the spin-off, one of which was the TEGNA Stock Fund, and the other, the Gannett Stock Fund. [Trial Ex. 96] §§ 5.7, 6.4 (describing the function of the Gannett Stock Fund, an employee stock ownership ("ESOP") plan); *id*. at § 6.7 (requiring the establishment of the TEGNA Stock Fund, a legacy stock fund).

7. As relevant here, the Governing Document specifically provides that "the TEGNA Stock Fund shall be established to hold TEGNA shares," and explained that "in light of the historical relationship between [Gannett] and TEGNA, Inc., the TEGNA Stock Fund will be an investment option, frozen to new investments as of the Distribution Date." *Id*. at § 6.7. The Governing Document reiterates the requirement in its Appendix that the "Trustee shall maintain," among other investment options, the TEGNA Stock Fund (alternatively, the "Fund"), and that the "TEGNA Stock Fund will be a fund invested primarily in the common stock of TEGNA" and "will be frozen to new investments." *Id*. at 99 (App. C, subsection (r)).

8. The Governing Document also provides that "in connection with the Spin-Off, [Successor Gannett] will enter into that certain Employee Matters Agreement with [TEGNA]," which "may be used as an aid in interpreting the terms of the transitions described above." *Id*. at 1. In pertinent part, the Employee Matters Agreement provides that, after the date of spin-off, "all outstanding investments in the [TEGNA Stock Fund] under the … Plan shall be liquidated and reinvested in other investment funds offered under the … Plan, on such dates and in accordance with such procedures as are determined by" the Committee. [Trial Ex. 107] § 5.03(f).

9. The spin-off was completed on June 29, 2015. [Doc. No. 146] ¶ 6; [Doc. No. 107] ¶ 21. As planned pursuant to the terms of the spin-off, the Plan participants received one share of Successor Gannett common stock for every two shares of TEGNA common stock. [Doc. No. 146] ¶ 7; [Doc. No. 107] ¶ 21. The Plan participants' TEGNA stock was held in the TEGNA Stock Fund, which invested almost exclusively in TEGNA stock. [Trial Ex. 96] at 99 (App. C, subsection (r)); *see also* [Trial Ex. 107] §§ 5.03(d), (f).

10. In accordance with the Governing Document, the TEGNA Stock Fund was frozen to new investment, meaning a participant could only direct a sale of TEGNA stock from his or her account,

not buy it. [Trial Ex. 96] § 6.7 ("Participants may not make any further contributions to the TEGNA Stock Fund, but can elect to move amounts invested in the TEGNA Stock Fund to other investments."); *see also* [Trial Ex. 107] § 5.03(f) ("Participants in the SpinCo 401(k) Plan shall be prohibited from increasing their holdings in the Parent Share Fund under the SpinCo 401(k) Plan[.]"); [Doc. No. 170] (Apr. 25, 2023 (A.M.) Trial Tr.) at 73:24–74:1.

11. As before the spin-off, Plan participants were able to divest from the TEGNA Stock Fund and transfer their investments to other investments on the Plan menu. [Doc. No. 146] ¶ 9; [Trial Ex. 96] § 6.7; *Id.* at 99 (App. C, subsection (r)); *see also* [Trial Ex. 107] § 5.03(f).

### B. The Committee engaged in active Plan administration.

12. In connection with the spinoff, for the purposes of administering the Plan, the Board created the Retirement Plan Committee as the named trustee/fiduciary post-spinoff, consisting of John Held, Lori Locke, Caryn McGarry, Minakshi Sundaram, and David Harmon (the "Committee," referred to in the Complaint as the "Gannett Benefit Plans Committee"). [Trial Ex. 96] § 7.2; [Trial Ex. 106] at 2; [Doc. No. 170] at 70:19–72:16.

13. In addition, Stuart Potter, who was hired by Successor Gannett as a Senior Manager of Corporate Finance in August of 2015, was tasked with supporting the Committee members in discharging their responsibilities and attended every Committee meeting that occurred after his appointment. *See* [Trial Exs. 4–13, 15–16, 19, 22, 25, 28, 176] (Committee Meeting Minutes); [Doc. No. 172] (Apr. 26, 2023 (A.M.) Trial Tr.) at 318:22–320:14.

14. Beginning shortly after the spin-off, the Committee and Potter regularly reviewed and discussed the merits of the investments in the Plan. More specifically, the Committee engaged in the following activities:

a. The Committee met 20 times between July 7, 2015, and August 23, 2018 to discuss changes to the Plan's investment menu, meeting four times in 2015, nine times in 2016, five times in 2017, and twice in 2018. [Trial Exs. 1–13, 15–16, 19, 22, 25, 28, 176].

b. Agendas, along with any presentations and other materials scheduled for discussion, were circulated to Committee members before their meetings. *See* [Trial Exs. 49, 57, 63, 67, 69, 72–74, 76, 78, 84, 87, 172–73, 175–76].

c. Shortly after the spin-off and thereafter, the Committee, with Potter's assistance and guidance, reviewed, discussed, and evaluated the merits of the TEGNA Stock Fund.[1] More specifically, the Committee considered as early as November 2015 the need to "determine the appropriate method of divesting Gannett and TEGNA stock" in consultation with an investment consultant, legal, and human resources. [Trial Ex. 54] at 7. And in most

---

[1] With respect to the minutes, the Court finds that the evidence established that those minutes, which were relied upon centrally by Plaintiffs' expert witness as evidence of a lack of prudence and monitoring, did not reflect the breadth or substance of the discussions at those meetings, including, as relevant here, the discussions concerning the TEGNA Stock Fund specifically. *See* [Doc. No. 172] at 327:18–328:2 (meeting minutes did not list all attendees); *id*. at 329:1–338:10 (Q: "[T]he … five issues you discussed, affiliation, potential appreciation, frozen nature of the stock fund but people could move it out, the blackout period, the plan documents, did you discuss those issues in some form or fashion with members of the Committee in the, let's say, first six months that you were at Gannett?" A: "Yes, they were discussed."); *id*. at 341:6–342:20 (omission of specific fund names from meeting minutes does not mean those funds were not discussed); *id*. at 345:12–15; [Doc. No. 173] at 524:12–525:6 ("[I]t's shown in this chart as well as Mr. Potter's testimony today, that [the Fund] was a recurring topic"); *see also* [Trial Ex. 52] (Draft Nov. 2015 Committee Meeting Presentation) at 5 ("Determine appropriate method for divesting Gannett and TEGNA stock"); [Trial Ex. 53] (Updated Draft Nov. 2015 Committee Meeting Presentation) at 5 ("In consultation with new Investment Consultant, legal and HR, determine appropriate method of divesting Gannett and TEGNA stock"); [Trial Ex. 54] at 7 (the "Next Steps" slide on the draft Committee meeting presentation exchanged between Potter and Sundaram and other materials from the meetings with those advisors indicating that the TEGNA Stock Fund had been discussed, even in meetings for which the minutes reflected no such discussion). And in most meetings held during 2016 and 2017, the Committee discussed the monitoring reports regarding the TEGNA Stock Fund. [Trial Ex. 60] (March 24, 2016 email from Mr. Potter to Mr. Sundaram) ("I know Dave H mentioned addressing the TEGNA stock issue during the fiduciary training … this deck provides some insights into stock in 401K, the use of an independent fiduciary … they can read through it and will be helpful in the decision making at the April meeting which will be about the structure of the 401k plan"); [Trial Ex. 64] (Presentation by WTW to the Committee in March 2016) at 17 ("Possible next steps for consideration: review purpose for offering company stock as a DC plan investment, both in terms of Gannett Company Stock and Tegna Stock … Consider which participants would be affected by any changes to the design of the plan").

meetings held during 2016 and 2017, the Committee discussed the monitoring reports regarding the TEGNA Stock Fund. [Trial Exs. 6, 12–13, 15–16, 19, 25, 66].

    d.  On July 25, 2016, Potter, Sundaram, Engel, Harmon, and Locke met to discuss company stock funds in the Plan, including the TEGNA Stock Fund. [Trial Ex. 70].

    e.  The Committee specifically considered the TEGNA Stock Fund in light of the planned Cars.com spin-off, since that spin-off would result in the addition of a third single-stock fund to the Plan (in addition to the Gannett Stock Fund ESOP and the TEGNA Stock Fund). [Doc. No. 163-8] (Sundaram July 12, 2018 Deposition Tr.) at 68:21–70:22, 135:11–137:9; [Doc. No. 163-9] (Potter July 11, 2018 Deposition Tr.) at 168:1–169:16; [Trial Ex. 15] at 1; [Doc. No. 172] at 360:3–11. In that regard, the Committee considered, in particular, that the Cars.com spin-off would result in Plan participant owners of TEGNA stock owning stock in both TEGNA and Cars.com, necessitating the creation of a Cars.com Stock Fund within the Plan. *See id.* As a result, the Committee weighed whether it was an appropriate time to close the TEGNA Stock Fund. [Doc. No. 172] at 360:16–361:1; 362:4–9.

    f.  In light of the planned Cars.com spin-off, in February 2017, the Committee established the Gannett Co., Inc. 401(k) Savings Plan Committee (the "Subcommittee") specifically to address the divestiture ("sunsetting") of the TEGNA Stock Fund. [Trial Ex. 169] at 2 (Article I: Purpose of the Committee); *see also* [Doc. No. 163-8] at 69:13–22, 114:20–16, 135:11– 18; [Doc. No. 163-9] at 163:4–21, 168:1–169:16.

    **C.  The Committee timely solicited the advice of independent investment advisors.**

15. The Committee solicited the guidance of recognized third-party experts, who regularly participated in Committee meetings. *See* [Trial Exs. 1, 3, 6, 8, 10–13, 15–16, 19, 22, 25, 28, 176]

7

(attendance at Committee meetings included a wide variety of third-party advisors); [Doc. No. 171] at 325:21–327:4; [Doc. No. 173] at 527:21–528:9 (describing fiduciary training). In that regard, the Committee solicited the advice of Willis Towers Watson ("WTW"), whose representatives trained the Committee members on their fiduciary duties of diversification and prudence under ERISA. [Trial Ex. 60] ("I know Dave H mentioned addressing the TEGNA stock issue during the fiduciary training"); [Trial Ex. 62] (WTW fiduciary training presentation) at 4–6; [Doc. No. 163-3] (McGarry July 18, 2018 Deposition Tr.) at 44:1–16; [Doc. No. 163-6] (Harmon July 17, 2018 Deposition Tr.) at 41:10–42:18, 118:4–120:6.

16. As their investment advisor, WTW provided the Committee with, among other things, research on single-company stock funds and how other fiduciaries dealt with such funds. *See* [Trial Ex. 61]; [Doc. No. 163-3] at 20:17–21:3; [Doc. No. 163-6] at 25:4–11, 25:22–26:11; [Doc. No. 163-8] at 26:2–7, 27:17–28:5, 36:1–39:1, 105:16–106:21; [Doc. No. 163-9] at 14:3–15:1, 116:18–117:19.

17. WTW also made presentations to the Committee on fiduciary issues generally and on the TEGNA Stock Fund specifically. *See, e.g.*, [Trial Exs. 9–11, 62, 111]; [Doc. No. 163-3] at 21:20–22:5.

18. At the Committee's request, WTW began providing quarterly Plan performance monitoring reports. [Trial Exs. 12–13, 19, 21, 66, 111, 174, 176].

19. Potter, in his capacity as an advisor to the Committee, solicited the advice of Successor Gannett's in-house and outside counsel about the TEGNA Stock Fund and was advised that there was no deadline for closing the Fund. [Doc. No. 172] at 328:19–331:2. Potter also submitted requests for proposals for managing the divestment of the TEGNA Stock Fund from potential independent fiduciaries, specifically the investment advisory firms Evercore and State Street.

Potter reviewed their responses and met with representatives of both companies. [Trial Exs. 48, 83]; [Doc. No. 172] at 371:17–372:25.

20. Between May 18, 2016 and June 7, 2016, Sundaram and Potter further explored retaining Evercore as an investment manager for the TEGNA Stock Fund and closing the fund, working with David Cohen, then a Managing Director at Evercore. *See* [Trial Ex. 68].

21. While the Subcommittee sought an independent fiduciary for the divestiture, the Committee also solicited advice on the handling of the TEGNA Stock Fund from WTW, the Plan's investment advisor, and Vanguard. Both companies presented to the Committee options for divesting, or "sunsetting," the TEGNA Stock Fund. [Trial Ex. 16] at 1–2; [Doc. No. 172] at 363:18–364:19; 364:20–366:4; [Trial Ex. 82] at 5.

22. On May 19, 2017, Potter recommended that the Committee hire Evercore as the independent fiduciary of both the TEGNA and Cars.com Stock Funds to handle the sunsetting process. [Trial Ex. 48]; [Doc. No. 172] at 372:24–373:3. The Committee accepted the Subcommittee's recommendation. [Doc. No. 172] at 373:1–3.

23. In June of 2017, Evercore presented to the Subcommittee key considerations for fiduciaries deciding whether to liquidate a legacy stock fund, outlined the sunsetting process, and explained Evercore's assessment of relevant industry standards and trends. [Trial Exs. 18, 85].

24. On July 28, 2017, the Committee formally retained Evercore as independent fiduciary and investment manager for the TEGNA Stock Fund and the Cars.com Stock Fund. [Trial Ex. 43]; *see also* [Doc. No. 163-9] at 133:1–134:4.

25. Evercore offered the Committee significant experience as an independent fiduciary to sunset legacy stock funds. [Doc. No. 163-5] (Cohen Apr. 11, 2022 Deposition Tr.) at 37:13–39:4,

9

47:24– 48:3, 49:8–18 (explaining experience); [Doc. No. 170] at 157:5–24; [Doc. No. 173] at 452:24–453:16, 458:15–20.

26. According to its engagement letter, Evercore, during its engagement, "at all times" had "the exclusive fiduciary authority and responsibility under the Plan and ERISA, in its sole discretion, to determine whether continuing [the TEGNA Stock Fund] as an investment option in accordance with the terms of the Plan prior to the Final Transfer Date is prudent under ERISA." [Trial Ex. 43] § 4.

27. The engagement letter also gave Evercore authority to "exercise any or all of the following powers, and to instruct the trustee of the Plan accordingly: (i) to determine the timing and manner of liquidating the TEGNA … common stock held in each Stock Fund; (ii) to liquidate the TEGNA … common stock … in an orderly manner, either following the Final Transfer Date, or an earlier date in connection with a determination that holding each such stock is no longer prudent under ERISA." *Id.* § 5; *see also* [Doc. No. 172] at 385:23–386:2; [Doc. No. 173] at 461:16–462:6, 550:15–21, 551:5–12.

### D. The Committee considered how allowing for a period of voluntary divestment of the TEGNA stock would benefit Plan participants.

28. The Committee knew that the TEGNA Stock Fund was frozen and expected that, as a result, the percentage of Plan assets and the number of Plan participants invested in the TEGNA Stock Fund would decrease over time. [Doc. No. 172] at 334:14–19 ("We expected that over a period of time we would see a gradual decline in the number of the participation rate, as well as the number of shares in the TEGNA Stock Fund"); *see also* [Doc. No. 163-8] at 55:14–56:2; [Doc. No. 176] (Apr. 27, 2023 (A.M.) Trial Tr.) at 647:23–648:6.

29. The Committee made efforts to encourage voluntary divestment by Plan participants and to mitigate single stock exposure through notices and disclosures regarding the risks of single-

10

stock exposure. *See generally* [Trial Exs. 30–38, 89–91, 93–94, 134]; [Doc. No. 173] at 557:10–13.

30. The Committee considered and determined that retaining the TEGNA Stock Fund as a Plan investment option and allowing participants to decide when to divest would reduce the length of the "blackout" period, *i.e.*, the period during which Plan participants could not sell TEGNA stock, when the Committee ultimately decided to liquidate the fund. [Doc. No. 172] at 332:17–333:3, 334:14–19.

31. The duration of the blackout period is typically determined by the total number of shares to be liquidated and how quickly those shares are sold. [Doc. No. 172] at 332:17–19, 334:20–336:23, 375:1–375:8; [Doc. No. 173] at 518:17–519:11; [Doc. No. 176] at 643:7–18.

32. Industry experts advise against selling more than 10 percent of a stock's daily sales volume each day so as not to drive down the stock price. [Doc. No. 172] at 332:17–19, 334:20–336:14, 375:1–375:8; [Doc. No. 173] at 518:17–519:11; [Doc. No. 176] at 643:7–18.

33. The Committee understood from the presentations of industry experts that, during the blackout period, (a) participants with holdings in the TEGNA Stock Fund would not have access to those funds and would be locked out of the market; (b) the proceeds of TEGNA stock sold during the blackout period would not be immediately redirected to other investments, but instead would be held in cash until all shares were sold; and (c) because participants could not access their funds and would be locked out of the market during a blackout period, a longer blackout period is typically worse for participants, and a shorter blackout period typically benefits them. [Doc. No. 171] at 191:16–192:12; [Doc. No. 172] at 332:19–24, 335:15–23, 336:24–338:1; [Doc. No. 173] at 518:17–519:11.

34. In addition to its consideration of the blackout period, the Subcommittee also considered, in conjunction with advice from Evercore, the importance of the opportunity to exercise individual choice. [Trial Ex. 18] at 2; *see also* [Doc. No. 172] at 374:6–25. Specifically, Evercore outlined for the Subcommittee common considerations for selecting the length of a sunset period, including the likelihood that internal fiduciaries had access to inside information, the potential impact of seasonality on the price of the fund, and, as most relevant here, the need to communicate with Plan participants to give them the maximum opportunity to exercise their own judgment about when to divest and where to reinvest their assets. [Trial Ex. 18] at 2.

35. On June 6, 2017, the Subcommittee presented in a memorandum to the Committee its recommendation that a 12-month sunset period be adopted, [Trial Ex. 86]; and on June 8, 2017, after consideration, *see* [Trial Ex. 19] at 2–3, the Committee approved the recommendation to use a 12-month sunset period. *See id*.; *see also* [Doc. No. 146] ¶ 13.

36. Plan participants received frequent communications from the Committee, Evercore, and Vanguard about the impending closure of the TEGNA Stock Fund and their ability to divest before liquidation. *See* [Trial Exs. 123, 135–36]; *see also* [Doc. No. 172] at 387:22–388:16.

> **E. The Plan participants' investment in TEGNA stock did decrease over time through voluntary divestment, which reduced the blackout period.**

37. As of the date of the spin-off, the TEGNA Stock Fund accounted for 21.8 percent of Plan assets. [Doc. No. 176] at 647:1–648:6.

38. As of November 2015, the fund accounted for 16.77 percent of Plan assets. [Trial Ex. 58] at 7.

39. As of December 2015, the fund accounted for 15.8 percent of Plan assets. [Trial Ex. 66] at 23.

40. As of June 2016, the fund accounted for 13.5 percent of Plan assets. [Doc. No. 176] at 647:1–18.

41. As of December 2016, the fund accounted for 10.7 percent of Plan assets. *Id*. at 647:19–21.

42. As of June 2017, the fund accounted for just 5.37 percent of Plan assets. *Id*. at 647:21–22.

43. Evercore observed in the summer of 2017 that a 12-month sunset period (as opposed to a shorter period) could further decrease the amount of TEGNA stock to be liquidated, which would reduce the length of the blackout period. [Trial Ex. 18] at 1–2. Evercore's possible projections proved correct, and as of June 2018, the fund accounted for just 2.7 percent of Plan assets. [Doc. No. 176] at 647:1–8.

44. Evercore liquidated the TEGNA Stock Fund at a rate of approximately 8.4 percent of average daily sales volume. *Id*. at 638:16–24.

45. On August 23, 2018, after a blackout period of just 17 trading days, the liquidation was completed and the TEGNA Stock Fund was closed. [Doc. No. 146] ¶ 16; [Doc. No. 172] at 386:22–387:3, 388:17–20; [Doc. No. 176] at 639:8–17, 642:12–19.

    F. **The amount of time that the Committee allowed for the sunsetting of the TEGNA Stock Fund is close to the average divestment period within a sample of peer funds.**

46. Plan fiduciaries and sponsors commonly retain frozen legacy stock funds for a period of time after a company spin-off similar to the spin-off that occurred with TEGNA and Successor Gannett. [Doc. No. 173] at 517:22–519:15; [Doc. No. 176] at 624:14–625:5, 627:11–16. For example, the fiduciaries of the TEGNA plan (*i.e.*, the defined contribution plan maintained for TEGNA employees) kept the legacy Gannett Stock Fund open longer than the TEGNA Stock Fund was open in the Successor Gannett Plan. [Trial Ex. 107]; [Doc. No. 173] at 547:5–21.

47. The Subcommittee learned from its advisors that fiduciaries generally give plan participants between six and 24 months (with 12 months being the most common) to decide for themselves when to divest from a single-stock fund before a forced liquidation. [Doc. No. 173] at 548:11–15; *see also* [Doc. No. 172] at 375:10–23.

48. As is reflected in empirical studies, fiduciaries commonly use sunset periods ranging from six to 18 months, with 12 months being the most common choice. [Doc. No. 173] at 520:13–16; *see also* [Doc. No. 176] at 649:5–9. The larger the legacy stock fund, the longer the fiduciaries typically retain the fund. *Id*. at 521:16–19 ("That's a significant factor.").

49. As is also reflected in empirical studies, the Committee's retention of the TEGNA Stock Fund for a total period of 38 months (before and during the sunsetting period) was slightly above average within a 2020 sample of peer plans that also addressed legacy stock holdings, with 38 months being roughly average based on 2021 data. [Doc. No. 176] at 635:13–17, 636:13–14.

## II. CONCLUSIONS OF LAW[2]

1. Consistent with its stated purpose, ERISA imposes fiduciary duties on those responsible for the administration of employee benefit plans and the investment of plan assets. Among the fiduciary duties that ERISA imposes are the duty of prudence and the duty to diversify. 29 U.S.C. § 1104(a)(1)(B)–(C).

2. The duty of prudence includes certain sub-duties, including the duty to investigate, to monitor, and the embedded duty to diversify. *Stegemann v. Gannett Co.*, 970 F.3d 465, 474–78 (4th Cir. 2020), *cert. denied sub nom. Gannett Co. v. Quatrone*, 142 S. Ct. 707 (2021). The duty of prudence, including all sub-duties, applies to *each* investment vehicle in the Plan, and to the Plan as a whole. *See id.*; *see also DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007)

---

[2] The Court's conclusions of law include conclusions as to pure legal questions as well as mixed questions of fact and law.

("[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds, which individuals may or may not elect to combine with a company stock fund, could theoretically, in combination, create a prudent portfolio.").

3. The independent duty of diversification—separate from the duty of prudence—exists with respect to the Plan as a whole. *See id.*

4. ERISA imposes a duty to diversify plan investments "so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(1)(C); *see also Stegemann*, 970 F.3d at 477 ("The point of the duty to diversify is not diversification for diversification's sake, but risk management."); *Plasterers' Loc. Union No. 96 Pension Plan v. Pepper*, 663 F.3d 210, 219 (4th Cir. 2011).

5. To establish a claim of breach of the duty of prudence, a plaintiff must show that the fiduciary failed to engage in procedural prudence, and that the failure to engage in procedural prudence caused the loss. *See Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 363 (4th Cir. 2014); *cf. Boyd v. Coventry Health Care Inc.*, 828 F. Supp. 2d 809, 815 (D. Md. 2011) ("Although the investment's underlying merits inform the prudence inquiry, many of the factors that *DiFelice* identifies relate to procedural prudence."). Thus, in assessing whether fiduciaries complied with the duty of prudence, the Court must examine whether the fiduciary used "appropriate methods to investigate the merits of the investment and to structure the investment." *DiFelice*, 497 F.3d at 420 (quoting *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir. 2001)); *see also Tatum*, 761 F.3d at 356. In doing so, the Court should consider the totality of the circumstances. *DiFelice*, 497 F.3d at 418.

6. The burden rests with Plaintiffs to show that a failure of procedural prudence. If Plaintiffs do establish a failure of procedural prudence, the burden of proof shifts to the defendant to show that the failure did not cause the loss. *Tatum*, 761 F.3d at 362.

7. As the Plan's named fiduciary, to act in a prudent manner, the Committee was obligated to administer the Plan "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims." 29 U.S.C. § 1104(a)(1)(B); *see also Tibble v. Edison Intern.*, 575 U.S. 523, 530 (2015); *DiFelice*, 497 F.3d at 420.

8. The Committee was also obligated to adhere to the terms of the Plan's Governing Document except where doing so would be imprudent. 29 U.S.C. § 1104(a)(1)(D); *see also* [Doc. No. 146] ¶ 2; [Trial Ex. 96] § 7.2; [Doc. No. 171] at 174:14–19.

9. Whether the Committee's maintenance of the TEGNA Stock Fund breached the Committee's duty of prudence and sub-duty of fund diversification turns on how a hypothetical prudent fiduciary in a like position with similar information would have divested of the TEGNA Stock Fund. 29 U.S.C. § 1104(a)(1)(B) (providing that fiduciaries must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims").

10. In determining whether a fiduciary acted with procedural prudence, courts have consistently considered whether that fiduciary employed various methods to assess an appropriate course of conduct, including "appointing an independent fiduciary, seeking outside legal and financial expertise, holding meetings to ensure fiduciary oversight of the investment decision, and

continuing to monitor and receive regular updates on the investment's performance." *Tatum*, 761 F.3d at 358.

11. Under the circumstances presented here, a prudent fiduciary considering the timing and other circumstances of divestiture would have weighed the risks of single stock fund holdings against the risks of forced and/or rapid divestiture. *Tatum v. RJR Pension Inv. Comm.*, 855 F.3d 553, 562 (4th Cir. 2017) (leaving open the factual question of whether a prudent fiduciary may have postponed divestment to mitigate the risk of legacy stock short-term loss of value); *see also Reetz v. Lowe's Companies, Inc.*, 2021 WL 4771535, at *45 (W.D.N.C. Oct. 12, 2021), *aff'd sub nom. Reetz v. Aon Hewitt Inv. Consulting, Inc.*, 74 F.4th 171 (4th Cir. 2023) ("The reasonably prudent fiduciary standard merely requires that fiduciaries reach a well-reasoned decision after weighing the risks and benefits and considering other alternatives.").

12. In weighing the risks of single stock holdings against the risks of forced and/or rapid divestiture, a prudent fiduciary considering the timing and other circumstances of divestiture would have held regular meetings to review and discuss the risk tradeoffs. *Tatum*, 761 F.3d at 358; *see also* [Doc. No. 173] at 490:13–16 ("[E]ach … fund … has to be monitored and evaluated on a regular and periodic basis."); *id*. at 514:21–24 (explaining that for evaluating prudence, "you do look to the process they went through, the procedures they followed, certainly how often did they meet and did they have engagement during those meetings").

13. In weighing the risks of single stock holdings against the risks of forced divestiture, a prudent fiduciary in a like position (including with similar investment management knowledge) considering the timing and other circumstances of divestiture would have solicited advice from independent experts in investment management, and possibly an independent fiduciary. *See DiFelice*, 497 F.3d at 421 ("We stress that U.S. Airways *twice* engaged independent advisors—

once during the class period, and once marking its end.") (emphasis original); *see also* [Doc. No. 173] at 514:21–22, 515:6–9 (for evaluating prudence, ask "did they utilize experts…Did they turn to experts like Towers Watson, did they ask Vanguard for their input in terms of plan administration[?]").

14. In weighing the risks of single stock fund holdings in connection with the timing and other circumstances of divestiture, a prudent fiduciary would have accounted for the Plan participants' exposure, including changes in the exposure over time. *Tatum*, 761 F.3d at 358, and would also have assessed mitigation measures to address the Plan participants' exposure, including communications about the risks of single stock exposure and the broader array of investment options. *See DiFelice*, 497 F.3d at 421 ("[H]ere we examine the totality of the circumstances, including, but not limited to … the disclosures made to participants regarding the general and specific risks associated with investment in company stock[.]").

15. The Committee acted as a hypothetical prudent fiduciary would have, including by having timely and regular meetings, both with and without advisors, to discuss the risks of maintaining the TEGNA Stock Fund and the risks associated with divestiture, and thereby formulated a considered approach for divestiture.

16. Because the Committee acted with procedural prudence in its approach to the divestiture of the TEGNA Stock Fund, and as a hypothetical prudent fiduciary would have, the divestiture was therefore timely and prudently made, and the Committee did not breach its duty to diversify.

### III.   VERDICT

For the foregoing reasons, the Court finds in favor of the Defendants on all claims, and against the Plaintiffs; and it is hereby

**ORDERED** that the Clerk enter judgment pursuant to Federal Rule of Civil Procedure 58 in favor of the Defendants, Gannet Co., Inc., the Successor Gannett Retirement Plan Committee, and individual Committee members.

The Clerk is directed to send a copy of this Order to all counsel of record.

December 5, 2023  
Alexandria, Virginia

/s/  
Anthony J. Trenga  
Senior U.S. District Judge

19